(126 So. 848)

# WALKER v. STATE.

## 8 Div. 142.

Supreme Court of Alabama.

March 13, 1930.

O. Kyle, of Decatur, for appellant.

Charlie C. McCall, Atty. Gen., for the State.

## BROWN, J.

The appellant, on April 27, 1929, killed Wesley White by shooting him with a pistol, and on his trial was convicted of murder in the second degree, and, as a punishment for the offense, was sentenced to serve thirty-five years in the penitentiary.

The rencounter between the deceased and the defendant took place at night between 10 and 11 o'clock on the side of a public road on Wolf's Mountain in the eastern part of Morgan county, some two or three miles from the nearest habitation. The meeting of the parties at this place, so far as the evidence shows, was accidental, and aside from the defendant and the deceased, two persons were present and witnessed the difficulty. These were Miss Ruby Morrow, who accompanied the deceased in his car, and Lewis Gullion, who was with defendant in defendant's car.

Miss Morrow, who was introduced as a witness for the prosecution, to state the substance of her testimony, testified that deceased driving his car, accompanied by witness, approached the place of the difficulty going north, and drove to one side of the road for the purpose of turning the car, when they discovered that the brakes on the car were out of order, and deceased got out of the car to see what the trouble was, and after they had been there about ten minutes they saw the lights of the defendant's car approaching, to quote her language: "The car that I saw coming, was coming from the direction of Un-ion Hill; this car that I saw was going in the direction that we came from; it was headed in the direction that we came from. This car that came up, drove by where we were, about fifty steps; and then backed down; when the car was passing by nothing was said: when it backed back it was about twelve—or between twelve and fifteen feet, I reckon, from us. He (defendant) stopped his car and said: 'Who is that?' When he first said that he hadn't got out of his car; he said: 'Who is that?' and Wesley White didn't answer him, and I told him to answer, and he opened the door of the car and waited for another call, and the defendant asked again: 'Who is that?' and Wesley White said: 'It is us.' The defendant, Fred Walker then said: 'Whose car is it?' I recognized his voice when he spoke, and Wesley White said: 'It is my car.' Fred Walker, the defendant, got out of his car and started up there. Mr. White told him not to come up there, and he said cut out arguing with him. * * * He said: 'Why should you tell me not to come up there, I wanted to see if anybody was hurt or in trouble in any way?' Wesley White again told him not to come up there, * * * and he (defendant) came on any way. He came up to where we was (were), and I began to talk and (asked) him to go on and not be raising trouble like that, and he told me he wasn't raising trouble. I talked to him all the time to keep him from Wesley. I told him: 'I told you there wasn't anyone up here and he did too, and why did you come up here?' And Wesley said: 'She told you there wasn't anyone up here,' and said: 'Fred what did you come up here for?' and Walker, the defendant said: 'Don't you get too fresh, I will end you up here, right here.' There was nothing else said then; the defendant then caught me by the arm and pushed me and shoved me as hard as he could, and Wesley grabbed at me, and when he stooped down to pull me up, Fred Walker, the defendant, reached over my shoulder and shot Wesley White through the head; he shot twice but he didn't hit Wesley but once. Wesley White shot twice, but did not shoot until after the defendant, Fred Walker, had shot twice. When Wesley White shot he had his right arm around me, and he had his pistol in his right hand when he reached to catch me, and he still had his arm around me with his pistol in his right hand; and he shot with his right hand. He fired two shots and then he fell; when White fell, Walker turned and went back to his car."

On cross-examination, this witness stated, among other things: "It was the first shot, in my judgment, that killed Mr. White. That shot entered on the left hand side of Mr. White's head, above the upper part of the cheek in front of his ear, and came out on the right side of his neck, severing a jugular vein." That when defendant shot,

White grabbed the witness with both hands and stood up for a little bit, then fell and died there. The evidence is without dispute that the weapon used by the defendant was a 38-caliber Smith & Wesson special.

Lewis Gullion, the other eyewitness, was offered by the defendant, and testified in respect to what occurred at the place of the difficulty and immediately before: "We were going in the direction of Mr. Irwin's, which I think was Southwest. We were going through woods over there on the road—the road went through the woods—and there was an automobile parked on the side of the road. We were in the road. The road at that place has got a curve in it; the night was dark; the way that we saw that automobile was, as we came around the curve the lights of our car shone on the windows of the parked automobile. We stopped our car about fifteen or twenty yards from the parked automobile —Mr. White's car; we were not exactly even with the parked automobile when we stopped. * * * Fred Walker was driving our car; when we stopped, Fred got out of the car and walked back towards Mr. White's car, and he said: 'Do you need any help?' He didn't get any answer, and he called again and says (said): 'Do you need any help?' and White, I reckon it was Mr. White, said: 'No, and d——n you, don't you come on up here.' Fred said: 'I don't want to have any trouble with you; I stopped here like a man to see if you needed any help.' Mr. White then said: 'Yes, and you are all time stopping where you haven't got any business.' Mr. Walker, the defendant, then said: 'You needn't get so hard boiled, I never stopped here for any trouble, I stopped like a man, and I will go on. I thought you might need some help.' When Fred said that this girl that was there (Ruby Morrow) commenced hollering: 'Don't do that, don't do that, he is fixing to leave.' * * * When this trouble was going on I was in Fred Walker's car; I could not see the parties, it was so dark; I did not see who fired the first shot, but I saw the flash of the first shot; the flash of the first shot came from the direction of where this car was parked out there, and came kinder in the direction of where this defendant was, in the direction of our car. That was the flash of the first shot fired. I saw the flash of two or three or more shots; there were four or five shots fired, I couldn't be positive which. I could not tell the direction the second shot was fired. After the first shot, the other three or four came together. After the shooting the defendant came back to the car where I was, leaned up against the car and said: 'Lewis, he shot me; I can't drive the car,' etc."

The testimony of defendant, given in his own behalf, was in substance the same as that of the witness Gullion, except he testified that when he inquired "if they needed any help," and Mr. White replied: "No, and G——d d——n you, don't you come up here," in reply to that he said: "I beg your pardon, I was mistaken in who it was, I thought it was Mr. Goodson." And further that White fired the first shot; that he (defendant) did not take his pistol out of the holster until after he was shot; that he was shot through the body, and after he was shot he was able to walk to his car, and was able to sit up for a few minutes, but after the first few minutes was not able to sit up.

■■ In view of the fact that we have reached the conclusion that the judgment of conviction must be reversed for errors occurring on the trial, we deem it unnecessary to comment on the evidence further than to say that the trial court entertained the opinion that on the evidence as a whole, the question as to whether the defendant was free from fault, and therefore entitled to invoke the doctrine of self-defense, was for the jury, and in this we concur. While it is not essential that the accused must have entertained a specific intent to provoke or bring on the difficulty, to put him at fault, his words or acts, viewed in the light of circumstances by which he is surrounded, must be offensive or wrongful; "the law required that he should be mindful in this regard of the probable consequences of any *wrongful* word or act." Madry v. State, 201 Ala. 512, 78 So. 866, 868; Smith v. State, 15 Ala. App. 662, 74 So. 755; 13 R. C. L. 823, § 127.

The defendant reserved an exception to the following part of the oral charge of the court dealing with the doctrine of self-defense: "The burden is on the defendant to reasonably satisfy your minds; first, that at the moment of firing the shot that took the life of Wesley White, he was in imminent, impending, immediate danger of *losing his life,* or he reasonably appeared to be in such danger, and *that the defendant then and there believed that he was in such danger.* And, if I haven't said it, *he must be in actual danger and believe it,* or be in reasonably apparent danger and believe he is in such danger." (Italics supplied.)

■ This instruction is unsound in two respects. The law gives one, who is otherwise in a position to use force in defense of himself, the same right to use such force to extricate himself from threatened great bodily harm, as it does to prevent his life from being taken. Twitty v. State, 168 Ala. 59, 53 So. 308. And "if the defendant was in actual imminent peril of his life, or of serious bodily harm, at the time he shot deceased, and the other conditions requisite to the exercise of * * * self-defense were present, his honest belief in such peril is not material, and the law will make no inquiry as to its existence. The requirement of honest belief is applicable only to a state of reasonably ap-

parent peril." O'Rear v. State, 188 Ala. 71, 66 So. 81, 82; Jackson v. State, 77 Ala. 18; Dolan v. State, 81 Ala. 17, 1 So. 707.

As we have shown, there was evidence from which the jury might have found that the defendant, at the time he first fired at deceased, had been shot through the body by the deceased and was in actual imminent peril of losing his life or suffering further serious bodily harm; that the assault on the defendant by the deceased was unprovoked, and was manifestly murderous in character; and that deceased was then in the act of effectuating his murderous purpose by the use of a deadly weapon. The trial court, therefore, erred in refusing charge 4 requested by the defendant.

The doctrine asserted in this charge 4 is fully recognized in our decisions, the decisions of other jurisdictions, and by text-writers, and is firmly established as part of the law of self-defense. Bostic v. State, 94 Ala. 45, 10 So. 602; Matthews v. State, 192 Ala. 1, 68 So. 334, 335; Beasley v. State, 181 Ala. 28, 61 So. 259; Madison v. State, 196 Ala. 590, 71 So. 706; Suell v. Derricott, 161 Ala. 259, 268, 49 So. 895, 23 L. R. A. (N. S.) 996, 18 Ann. Cas. 636; Beard v. United States, 158 U. S. 550, 15 S. Ct. 962, 39 L. Ed. 1086; 13 R. C. L. 827, § 132.

The doctrine was restated in Matthews v. State, supra: "Where the party slain by the defendant made a sudden, entirely unprovoked, murderous attack upon the defendant; the assailant being then armed with a deadly weapon, and in the very act of effecting upon the defendant such murderous purpose. In such case, *where the evidence is clear and without conflict or adverse inference, the law concludes that no duty to retreat rests on the defendant*—its theory being that, under such circumstances, retreat would not serve the humane purpose the law intends to subserve by its exaction of one, wholly without fault in the premises, less immediately and suddenly menaced by an adversary."

That is not to say that this principle of law is applicable and to be given in charge only "*where the evidence is clear and without conflict or adverse inference*," but where the evidence is such, *as a matter of law*, the defendant is under no duty to retreat.

Where the evidence is conflicting, and phases of it support the pertinent hypothesis, it becomes a question for the jury, and the authorities are uniform in holding that it is the right of the accused to have instructions given based on any material hypothesis which the evidence tends to establish. Munkers v. State, 87 Ala. 98, 6 So. 357; Greil & Brother v. Marks, Fitzpatrick & Co., 51 Ala. 566; Alexander v. Alexander, 71 Ala. 295; Hammil v. State, 90 Ala. 581, 8 So. 380; Cain v. State, 16 Ala. App. 303, 77 So. 453.

In Storey v. State, 71 Ala. 336, the court in treating the duty to decline combat or retreat in "cases of mere assault, or of mutual combat, where the attacking party, as expressed by Mr. Bishop, has not 'the *purpose of murder in his heart*,'" observed: "Where, however, the assault is manifestly *felonious in its purpose and forcible in its nature*, as in murder, rape, robbery, burglary, and the like, as distinguished from *secret* felonies, like mere larceny from the person, or the picking of one's pocket, the party attacked is under no obligation to retreat. But he may, if necessary, stand his ground and kill his adversary."

The court, after thus stating the doctrine, in dealing with refused charges, to quote from the statement of the case, "instructing the jury, in substance, that the defendant had the right to show the violent, dangerous, overbearing and turbulent character of the deceased, if he could, for the purpose of illustrating his own conduct in shooting the deceased; and that, if they find that Hall was a man of such bad character, 'then defendant was authorized to act upon *less appearances of an intention* to harm him, than would usually justify him,'" further observed:

"These principles are of easy application to the evidence, and some of the charges were misleading in failing to clearly recognize them. (Italics supplied.)

"The law requires that the circumstances surrounding the prisoner should have created in his mind a *reasonable belief of his own imminent peril*, and of an *urgent necessity to take the life* of his assailant, as the only apparent alternative of saving his own life, or else of preventing the infliction of great bodily harm. Such peril must be, to all appearances, present and immediate, and the belief in the necessity of killing must be well founded and honestly entertained; and of these facts the jury must be the judge." Storey v. State, 71 Ala. 337.

This modification of the doctrine, if such it may be termed, is limited in its application to the concurrent doctrine of *apparent impending peril*, asserted in the charge then under consideration.

There is nothing in the utterances last quoted that would deny application of the doctrine first stated in that case (Storey v. State, supra), to the case in hand, where the evidence justified the jury in finding that the defendant at the time he fired the fatal shot was in *actual imminent peril* from a murderous assault being made by the deceased, and his murderous purpose was made manifest by the overt act of deceased in shooting the defendant through the body. Under such circumstances, the defendant's "honest belief in such peril is not material, and the law will

make no inquiry as to its existence." O'Rear v. State, supra.

In Matthews v. State, supra, and Hutcheson v. State, 170 Ala. 30, 54 So. 119, 120, the court was reviewing charges dealing with the right of self-defense under the doctrine of *apparent impending peril*. The charge in the Matthews Case, 192 Ala. 2, 68 So. 334, 335, was in this language: "The court charges the jury that, if the defendant shot under a *bona fide belief* that his life was in danger, *and had, under all the circumstances, a reasonable cause to believe that he was in imminent danger* at the moment the shot was fired, then, the defendant cannot be convicted." (Italics supplied.)

While charge No. 1 in the Hutcheson Case does not appear in the report of the case, an examination of the original record shows that it was predicated on the same doctrine—*apparent impending peril*—the hypothesis of the charge being that if "Mike Melton (the deceased) was reaching for the gun in the hands of his daughter, and Mike Melton was near enough to his daughter to have gotten the gun," etc., and the criticism of the charge was that it "does not hypothesize that defendant at the time of the killing honestly *entertained the belief* that she was in imminent peril, and that there was an urgent necessity to take the life of her assailant in order to save her own life or of preventing the infliction, on her, by her assailant, of great bodily harm." (Italics supplied.)

■ Refused charges K2 and 3 are argumentative and were well refused.

■ Refused charge R pretermits consideration of all the evidence, and the principle embodied in the charge was covered by the oral charge.

■ Refused charge O, though covered by the oral charge, is sound in principle. While the law defines, in a sense, what constitutes a reasonable doubt, still whether or not a doubt of guilt arises in the particular case, and whether or not such doubt is a reasonable doubt, is for the jury to determine. The principle embodied in this charge has been approved in the following cases: Hodge v. State, 97 Ala. 37, 12 So. 164, 38 Am. St. Rep. 145; Hunt v. State, 135 Ala. 1, 33 So. 329; Turner v. State, 124 Ala. 59, 27 So. 272.

■ While the burden was on the state to show, by the required measure of proof, that the defendant was not free from fault, still the jury had the right to look to all the evidence, including that offered by the defendant, to determine whether or not he was free from fault. Refused charge 6, for this reason, was invasive of the province of the jury.

■ We deem it unnecessary to treat the ruling of the court on the objections to the questions propounded to the impeaching witnesses Garrison and Gibson, as to whether these questions sufficiently conformed to the predicate, as these questions may not arise on another trial. We observe, however, that the rule of the cases is that where a witness is sought to be impeached by a contradictory statement, the attention of the witness sought to be impeached should be directed "with reasonable certainty to the time, place and person involved *and the supposed contradiction*." Nelson v. Iverson, 24 Ala. 9, 60 Am. Dec. 442; Southern Ry. Co. v. Williams, 113 Ala. 620, 21 So. 328.

If the predicate is as to an exact specific contradictory statement, and does not embrace one "of like import" or "in substance," it is error to allow such question to the impeaching witness. Murph v. State, 153 Ala. 67, 45 So. 208; McClellan v. Lyle-Taylor Grain Co., 205 Ala. 59, 87 So. 596. The reason for this is, if the question put to the impeaching witness had been put to the witness to be impeached, it might have provoked a different answer, or a reasonable explanation.

For the errors noted, the judgment is reversed.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and THOMAS, JJ., concur.