142 So. 56

**BRIDGES v. STATE.**

6 Div. 10.

Supreme Court of Alabama.
May 26, 1932.

Crampton Harris and Albert Boutwell, both of Birmingham, for appellant.

Thos. E. Knight, Jr., Atty. Gen., for the State.

KNIGHT, J.

The appellant, R. A. Bridges, was indicted for the offense of murder in the first degree. A copy of the indictment appears in the report of the case. The appellant was convicted of murder in the first degree, and his punishment fixed by the jury at imprisonment in the penitentiary of this state for the term of his natural life. From this conviction and sentence, the present appeal is prosecuted.

It appears from the bill of exceptions that on the evening of July 10, 1931, a bomb, made of twenty-five sticks of dynamite, wrapped in a newspaper, was thrown through or against a glass window of the plant of the Pure Milk Company located at 2416 Avenue G in the city of Birmingham, Ala. At that time, there were a number of people in the building. The frontage of the plant on Avenue G is ninety feet. The building used and occupied by the Sunshine Dry Cleaners is west of the Pure Milk Company's plant, and the building occupied by the Lincoln Motor Car Company is located to the east.

George D. Hennigh, one of the witnesses examined by the state, on the trial, testified, as to what occurred immediately following the explosion of the bomb, as follows: "I was in and about the plant on the night of July 10, 1931, when the explosion occurred. I heard a crash, and in a minute or a minute and a half the explosion occurred. I did not go outside. I stayed in my office. My office was about fifty feet east of the point of explosion. On a direct line west from where my office is located there is a brick wall, and to the right of that there was two glass doors. They were blown approximately twenty-five feet from where they were originally. We have two ammonia compressors in the room where the explosion occurred, and the two compressors have a capacity of around seventeen tons of refrigeration each, and the two machines were standing on blocks which are imbedded in the earth about four feet. They have a solid foundation; and there is also an ammonia drum there and about eight condensors, and there is also a cooling tower in that room to cool water that comes from the machine, and also two thirty-horse power motors, belts connecting the motors with the compressors. Practically all the plate glass of the building was blown out,—in fact the place was competely wrecked. There were seven of us altogether in the building. The sidewalk in front of the plant is about six feet. Avenue G is a very much traveled thoroughfare. * * * Immediately after the explosion I got out of the office as quickly as I could and went towards where the compressing room was a total wreckage. I walked out to the sidewalk and saw two boys about ten feet from the curbing dressed in white. I ran over to help them on the sidewalk, and then some of the boys were coming out of the office and a crowd was running toward them, and they

came and took the boys off, and I turned around and saw this little negro boy laying there with his insides blown completely out. I did not know his name. I did not see the boys removed."

Burg Gilpin testified that he made the bomb, and drove the car in which defendant and he went to the plant of the Pure Milk Company on the occasion the bomb was thrown. That they carried the bomb in the car, and that defendant threw the bomb against the window and into the window. That as soon as the bomb was thrown, the defendant immediately came back to the car and drove off.

John Ferrell McAvoy also testified in behalf of the state, and it appears from his testimony that the bomb was made in the evening of July 10, 1931, and was put in his car. That the defendant carried the bomb and put it in his (witness') car, and then he, defendant and Mrs. Cline went to town (Birmingham) in his car; that they put him out at Ritz Billiard parlor. That his car was a blue Chevrolet coach, 1930 model.

From the evidence, it would appear that both Gilpin and McAvoy were accomplices in the bombing of the Pure Milk Company's plant, and hence the defendant could not be convicted on the uncorroborated testimony of these two witnesses. However, other witnesses, testifying on behalf of the state, corroborated the evidence of the alleged accomplices, and their testimony tended to connect the defendant with the commission of the offense. In fact, one witness, Ada Lance, who was at the time working for Sunshine Dry Cleaning Company, testified: "I saw R. A. Bridges at or near the Pure Milk Plant, on the night of the explosion. He was standing on the sidewalk in front of the Pure Milk Company, I was standing in the window of the Sunshine Cleaners. I was looking to my left towards the Pure Milk Company. I saw a man walk up and throw a package into the Pure Milk Company. That man sitting back there threw the package [indicating defendant]. * * * The package was thrown through the glass next to the Sunshine Cleaners. Immediately before I saw the man throw the package, I saw an automobile pull up in front of the Pure Milk Plant. It was a five passenger dark Chevrolet car. There was a man got out of it and went to the sidewalk. They stopped the car in front of the Pure Milk Company. I saw R. A. Bridges throw a package in the Pure Milk Company. It was a large brown looking package. * * * When the package got about half way to the building there was a little blaze at the end of it. It was just a tiny blaze of fire behind the package."

This witness also testified that there were a number of people working in the building used by the Sunshine Dry Cleaners at the time of the explosion, and that the witness and one other girl in the Sunshine Dry Cleaners' establishment were hurt by the explosion.

The evidence showed that the deceased, Edward Francis Van Merkstyne, received fatal injury by the explosion of the dynamite bomb, and died as a result of the injuries on the following day.

The defendant was duly arraigned on July 25, 1931, and a due and proper order was made by the court setting the cause for trial on August 3, 1931. A proper order was also made, upon the arraignment, for a special venire of one hundred jurors to be summoned by the sheriff to serve as jurors in the case. It further appears that the court ordered "a list of the names of all jurors drawn for said week beginning Monday the 3rd day of August, 1931, together with those drawn upon this day, together with a copy of the indictment against each of the defendants be made, and the same to be forthwith served on each of the defendants by the sheriff" of Jefferson county. It also appears from the record that this order was fully executed by the sheriff on July 29, 1931. It thus appears that arraignment, setting of the day for trial, order for special venire, and the order for service of the venire and copy of the indictment, and service thereof by the sheriff, were in all respects regular.

■ After the jurors were qualified, it appeared that there remained only thirty-eight qualified to serve as jurors in the case. The defendant objected to being put on trial on the ground "that he was entitled to two strikes to the State's one," and the defendant further moved for a continuance on the ground that "a *new* venire should be summoned so that the quota could be completed." The court overruled the motion. This action of the court was eminently proper and within the terms of the statute. Code, § 8646; Riley v. State, 21 Ala. App. 655, 111 So. 649. To have drawn additional names of jurors, and placed them on the list, from which to strike the jury in the case, would have been erroneous. Fleming v. State, 20 Ala. App. 481, 104 So. 137; Ex parte State ex rel. Attorney General, 213 Ala. 78, 104 So. 139.

■■ After the selection of the jury, the defendant's attorney stated to the court that Mr. J. B. Fuqua, one of his witnesses, was ill, and that he was informed that the witness could not attend the trial, and defendant moved for a continuance on the ground that Mr. Fuqua was a material witness. No request was made by defendant that he be allowed to make a showing for this absent witness, or that he expected to make any proof by this witness that he was not prepared to make by other witnesses present. Nor did the defendant give the court the slightest intimation of what he expected to show by the witness. The court stated to counsel: "It may be that you have time now to take his testimony by

deposition by the time you reach the case." To this counsel for defendant replied: "Well, it may be, but we want the jury—they have the right to see the demeanor of every witness. They are entitled to that right, and we would like for them to be able to see and hear Mr. Fuqua's testimony rather than to just have a deposition brought into court, and we move that the case be continued until such time that we can be sure of getting this evidence." The motion for a continuance, under the circumstances, was addressed to the sound discretion of the trial judge, and will not here be revised except for abuse of that discretion. No such abuse appears, and the appellant can take nothing by his exception to this ruling of the court. Alabama, etc., Co. v. Wrenn, 136 Ala. 490, 34 So. 970; Humes v. O'Bryan, 74 Ala. 78; Wimberly v. Windham, 104 Ala. 409, 16 So. 23, 53 Am. St. Rep. 70; Kroell v. State, 139 Ala. 1, 36 So. 1025; Stevens v. State, 138 Ala. 71, 35 So. 122; Huskey v. State, 129 Ala. 94, 29 So. 838.

■ The court permitted the solicitor to offer evidence to show or tending to show, that, in the adjoining building to that in which the explosion occurred, there were, at the time the bomb was thrown into the plant of the Pure Milk Company, a large number of people. The argument against the admission of this testimony proceeded upon the theory that the curtain in the adjacent building was drawn, and consequently the thrower of the bomb could not know that there were people at the time in said building. There was evidence tending to show that one or more persons were at, or within, or near the window and, even if as an abstract proposition the appellant's contention is sound, which is not conceded, the same would have no application in this case for the reason stated. It abundantly appears also that the adjacent building was occupied by the Sunshine Dry Cleaners, and that there were, as a matter of fact, some forty or fifty people in the building at the time of the explosion, two of whom received injuries from the explosion. There was no error in the above-stated ruling of the court.

■ The appellant complains that the court committed error to his hurt, in permitting the state to show that two women, working at the time in the adjacent building, were injured. There is no merit in the contention. "Every homicide * * * perpetrated by any act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, is murder in the first degree." Code, § 4454.

The fact that the explosion was so great as to injure persons on the outside of the building, or within an adjacent building, was of the res gestæ, and the court properly allowed the state to make the proof that others were injured, as well as killed by the explosion.

Mr. Blackstone (4 Comm. 200) has this to say on the subject of murder, and universal malice: "Neither shall he be guilty of a less crime, who kills another in consequence of such wilful act as shows him to be an enemy to all mankind in general; as deliberately, and with intention to do mischief, discharges a gun among a multitude of people. So, if a man resolves to kill the next man he meets, and does kill him, it is murder, although he knew him not; for this is universal malice."

And after quoting approvingly the above from Mr. Blackstone, Mr. Justice Stone, in Mitchell v. State, 60 Ala. 26, makes this observation: "And we may mention the intentional wrecking of a passenger train on a railroad, by which a life or many lives are destroyed, as another instance of universal malice. The definition given in the statute, of this class, four, brings it precisely within the influence of the principle stated, and shows that this fourth class of murders in the first degree was intended to embrace homicides committed from universal malice."

It thus follows that the state in such cases, where universal malice is involved, may fully show the act done, its magnitude in consequences, including all pertinent facts which would tend to show the act was greatly dangerous to the lives of others. Of course, that others were injured by the act may be shown. It was therefore within the right of the state to show that the negro boy was also killed by the explosion. All of which testimony was a part of the res gestæ.

■ The state called as a witness one Alec Borders, and this witness after testifying that he had received injuries in the explosion, and that he had been carried to a hospital for treatment, was asked by the state this question, "As a matter of fact you have been in the hospital all the time until yesterday?" The defendant objected to the question, the court overruled the objection, and the defendant duly excepted. The point of defendant's objection was that the question called for incompetent, irrelevant, immaterial testimony, and that its purpose was to prejudice the jury. The question called for competent and material testimony, and was properly allowed. The testimony was competent to show the magnitude and extent of, and the hurtful effects flowing from, the explosion and under our authorities was properly allowed in evidence. Mitchell v. State, 60 Ala. 26; Newman v. State, 160 Ala. 102, 49 So. 786. The witness had already given the jury a full statement of his injuries. In this ruling of the court there was no error.

■■ The defendant examined in his behalf a witness by the name of Crockett, and at the conclusion of the defendant's testimony, the state called Fred McDuff to the stand.

The defendant objected to the examination of the witness, upon the ground that the solicitor had assured the court at the opening of the trial that Mr. McDuff, who was chief of police of Birmingham, would not be examined as a witness, and that upon this assurance the chief of police was allowed to remain in the courtroom. Before passing upon defendant's objection, the court said: "Let me ask him [referring to one of the attorneys for the state], are you going to ask Chief McDuff about anything except this fellow's statement?" There was no objection made by the defendant to the court's reference to Crockett, the witness for defendant, as "this fellow," and therefore the propriety of the court's statement in so referring to a witness, in the hearing of the jury, is not presented for review, as supposed by counsel for defendant. It 'was within the sound discretion of the court to permit the state to call and examine the chief of police as a witness, and the court's action in that regard is free from error. At most, it was a matter addressed to the sound discretion of the court.

■ At the conclusion of the defendant's testimony, the state recalled the witness R. L. Crockett, examined theretofore by defendant, and propounded to him the following question: "I will ask you whether or not, after the bombing, you told Chief Fred McDuff that, at the time the bomb was thrown, Miss Lance was standing in the front window of the Sunshine Cleaners?" There was an objection to the question by the defendant, but the defendant's attorney subsequently informed the court that he would withdraw the objection. The witness replied to the question that he did not make such a statement. Thereupon the solicitor remarked: It is for the purpose of impeaching the witness." The witness was excused, and Mr. Fred McDuff was then called to the stand by the state, and after the witness had testified that he had a conversation with the witness Crockett, the solicitor thereupon propounded this question to the witness McDuff: "I will ask you whether or not, at the time you talked to him, he told you' that, at the time the bomb was thrown, Miss Lance was standing in the front window of the Sunshine Cleaners?" The witness answered: "I would not say that he told me she was standing there at that time, no sir." The solicitor then asked the witness McDuff the following question: "What did he tell you, chief?" The defendant objected to the question upon the ground inter alia, that the proper predicate had not been laid for the introduction of such evidence. The court overruled defendant's objection, and the defendant duly and legally reserved an exception to the ruling of the court. The witness, over the objection and exception of the defendant, was allowed to answer the question, and said: "He said she was standing in the window; not at the time the bomb was thrown, though."

The state then propounded this further question to the witness McDuff: "With reference to the throwing of the bomb, what time did he say Miss Lance was at the window?" The defendant objected to that question, assigning among other grounds that no proper predicate had been laid. The court overruled defendant's objection, and allowed the witness to answer the question, to which the defendant duly excepted. The witness, replying to the question, said: "He said, at the time that the car rolled up from the front and the man got out of the car with the bomb, that the young lady was standing at the window."

There is possibly no rule governing the production and introduction of evidence in any case better understood or more rigidly enforced, than is the rule which requires that a party, who wishes to impeach the testimony of an opposing witness by showing contradictory statements, shall lay a proper predicate therefor. The rule requires "that the attention of the witness, who is attempted to be discredited, should be called to the time, place and person involved in the supposed contradiction, in order that the faculties of the mind may be put in motion, and the memory aided by the train of ideas which such circumstances would be likely to suggest with reference to the subject-matter of inquiry. 4 Phil. Ev. 761. The rule, however, is satisfied, when the attention of the witness is called with reasonable certainty to the subject of the previous declarations." Nelson v. Iverson, 24 Ala. 9, 60 Am. Dec. 442.

In the case of Walker v. State, 220 Ala. 544, 126 So. 848, 853, it is said: "We observe, however, that the rule of the cases is that where a witness is sought to be impeached by a contradictory statement, the attention of the witness sought to be impeached should be directed 'with reasonable certainty to the time, place and person involved *and the supposed contradiction.*' Nelson v. Iverson, 24 Ala. 9, 60 Am. Dec. 442; Southern Ry. Co. v. Williams, 113 Ala. 620, 21 So. 328. If the predicate is as to an exact specific contradictory statement, and does not embrace one 'of like import' or 'in substance,' it is error to allow such question. * * * Murph v. State, 153 Ala. 67, 45 So. 208; McClellan v. Lyle-Taylor Grain Co., 205 Ala. 59, 87 So. 596. The reason for this is, if the question put to the impeaching witness had been put to the witness to be impeached, it might have provoked a different answer, or a reasonable explanation."

It follows, therefore, that the court committed error to a reversal in permitting, over the apt and timely objection of the defendant, the witness McDuff to answer the following questions: (a) "What did he tell you?" and

(b) "With reference to the throwing of the bomb, what time did he say Miss Lance was at the window?"

In his argument to the jury one of the solicitors for the state made the following statement: "I said the night after the explosion, or the next day, the cry went up from the city of Birmingham and the State of Alabama, that they wanted to take the life of the man who threw that bomb." The defendant asked that this statement be excluded from the jury. The bill of exceptions recites that the court overruled defendant's objection, and the defendant then and there duly and legally excepted. The argument was palpably improper. It was a statement of a fact not in evidence, and as to which no evidence could have been introduced. It was a direct appeal to passion, not to reason. Its only tendency was to inflame the minds of the jury. Immediate repressive measures should have been resorted to by the court. The prejudicial effect of such an argument was well nigh ineradicable. The court, by its action, gave judicial approval to the same.

While the conviction and the punishment of the guilty are greatly to be desired, and especially when such an atrocious crime, as the one shown by the evidence to have been committed in the instant case, by some one, yet the courts must not, in the trial of such cases, lose sight of either forms of law, the rules of evidence, or of what constitutes legitimate argument, lest in an effort to enforce the law, we perpetrate an even greater wrong— the sacrificing of the liberty, or life, of an innocent person. Prosecuting attorneys, in their zeal to vindicate the law, should not allow the excitement of the occasion, nor the exhilaration incident to success in any case, to lead them, in their arguments to the jury, beyond the domain of legitimate, or permissible, forensic effort. Anderton v. State, 209 Ala. 36, 95 So. 171; American Ry. Exp. Co. et al. v. Reid, 216 Ala. 479, 113 So. 507, and cases cited.

The court erred in not excluding on motion of the defendant the above-stated remarks of counsel for the State.

We have considered all other rulings of the court where objections were made, and exceptions reserved, but find no errors. There was no error committed by the court in refusing any of defendant's special charges.

For the errors pointed out above, the judgment is reversed and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and BROWN and FOSTER, JJ., concur.