The three-count indictment charged the appellant with forcibly assaulting the prosecutrix with intent to ravish and with attempting to take immoral or indecent liberties with a child, and with seeking to commit a lewd or lascivious act upon the body of female child under sixteen years of age. The jury found the appellant guilty as charged, and the trial court fixed punishment at twenty years in the State penitentiary.
The State's evidence proves beyond any reasonable doubt that the appellant is guilty as charged. Although the defense presented conflicting evidence after the State had rested, such questions were resolved by the jury. McBryan v. State, Ala.Cr.App., 368 So.2d 568, cert. denied, Ala., 368 So.2d 575. We are required on appeal to view the evidence presented by the State in its most favorable light. Bass v. State, 55 Ala. App. 88, 313 So.2d 208.
The thirteen year old prosecutrix in this case testified that she was babysitting for her aunt and uncle (appellant) on Saturday, January 13, 1979, the date of the incident. Her aunt and uncle lived in an apartment in Tuscaloosa. The prosecutrix stated that at approximately 2:30 p.m. her aunt left for work at the Zippy Mart leaving her with the couple's two infant children. The appellant had already gone to his job at Western Sizzlin. The prosecutrix had certain telephone conversations during the afternoon and received a five minute visit from two friends, Barry and Jerome Townsend, at approximately 7:30 p.m.
The appellant came home from Western Sizzlin at approximately 10:00 p.m. and sat *Page 678 
on the couch by the prosecutrix. After calling his wife at the Zippy Mart and watching television for a few minutes, the appellant asked the prosecutrix if she wanted "to screw." The prosecutrix testified that she "told him to go on and leave me alone." The prosecutrix stated that the appellant told her if she didn't "he would force it on me." The appellant then pulled the prosecutrix's clothes off, forced her to lie on the couch and "took his penis out of his pants." "He started kissing on me and all that. He kept holding my hands and kept kissing on me and I tried to get him off of me but he was too heavy . . . He tried to get it in me . . . He kept doing that and I couldn't get him off me and so finally the phone rang."
When appellant answered the telephone the prosecutrix stated "I got my panties and pants and ran to the bathroom and locked the door . . . I cleaned myself up and went back out . . . Carl was still on the phone and he told the person on the phone that I was in the bathroom and I hollered out that I wasn't." The phone call was from Barry Townsend. The prosecutrix stated that, after appellant's telephone conversation ended, "I told him that he was going to pay for what he did" (R. pp. 16-20).
"Q What did he say?
 A He said he would deny every bit of it and tell some stuff on me.
Q What kind of stuff did he say he would tell on you?
A That I asked him to screw me and all that.
Q And what did you say?
A I told him that they wouldn't believe him."
While the appellant was in the bedroom preparing to relieve his wife at the Zippy Mart, Barry Townsend called the prosecutrix back. After a short conversation, the prosecutrix stated that "Carl got the phone out of my hand" and "said who in the hell is this [into the phone] . . . didn't he know he wasn't supposed to be calling there that late."
The appellant then left for work and the prosecutrix's aunt came home. The prosecutrix spent the night with her aunt and went back home the next day. On Sunday night the prosecutrix reported the incident for the first time to her uncle, Donnie Steward. She did not immediately tell her mother because "I was afraid someone might believe Carl instead of me and I didn't want to hurt her."
On cross-examination, the prosecutrix testified that her uncle, Donnie Steward, had come by the apartment on Saturday around 6:30 or 7:00 p.m., before the incident occurred. She stated that she was crying on the occasion because the two infants "were hollering and carrying on and I couldn't get them to shut up." The prosecutrix gave a further account of her struggles against the appellant during his attack and described the white substance she found on her upper legs when she went to the bathroom.
The prosecutrix testified that she didn't tell her aunt what had happened when she got home from the Zippy Mart. She saw the appellant the next morning around 8:00 a.m., but didn't speak to him. The prosecutrix testified that she did not return to babysit after the incident.
On re-direct examination, the prosecutrix stated that she told her mother about the incident on Monday of the week following the assault. The prosecutrix's mother carried her to the Tuscaloosa Police Department where she reported the incident to Sergeant Shirley Fields. On further re-direct the prosecutrix stated that she told her aunt what happened in a telephone conversation before reporting the matter to the police. "She found out some how what happened that night over there at the apartments and she called me and asked me did it happen and I told her no and she finally got it out of me and I told her yeah, it did happen and I told her what happened that night."
On recross-examination the prosecutrix testified that the conversation with her aunt occurred on Monday night following the incident. The prosecutrix stated that the appellant had called her first that night *Page 679 
and had asked why she had told her "Uncle Donnie those things." The prosecutrix then had the conversation with her aunt, and her aunt came to her (the prosecutrix's) house later that night.
Barry Townsend testified that he and his brother, Jerome, visited the prosecutrix at appellant's apartment for "about five or ten minutes" at approximately 7:30 p.m. on January 13, 1979. Barry testified that he later telephoned the prosecutrix at approximately ten that night. "[W]hen I called her the first time, her uncle answered the phone and I asked if [the prosecutrix] was there and he said yes, but she is in the bathroom and to call back in about ten minutes. . . ." Barry stated that he heard the prosecutrix's voice in the background, but could not understand what she was saying.
Barry testified that he "called back fifteen or twenty minutes later" and that the prosecutrix answered the phone. "[S]he whispered and said bye and I didn't quite understand her and I said what and Mr. Allen got on the phone and started you know raving a little about calling over there. . . ." Barry stated that the appellant "hung the phone up" after telling him the prosecutrix "ain't supposed to be talking on the damn phone" while she was babysitting.
On cross-examination, Barry stated that the prosecutrix was "sort of cheerful" when he talked to her at the appellant's apartment around 7:30 p.m., but that she sounded upset when he talked to her later on the telephone.
At the conclusion of Barry Townsend's testimony the State rested its case. The appellant made no motions to exclude the evidence.
The appellant called as his first witness his wife, Linda Allen. Mrs. Allen testified that the prosecutrix was her niece. She stated that on January 13, 1979, she was employed at the Zippy Mart from three in the afternoon until eleven at night, and that her husband came in to work the eleven to seven shift in her relief. "[T]his night he came early because he got off at Western Sizzlin." Mrs. Allen testified that when she arrived home the prosecutrix was asleep and that she had no conversation with her. She further stated that the prosecutrix made no reference to the incident the following morning and did not seem upset. Mrs. Allen said that her husband argued with the prosecutrix about her staying "on the phone too much when she was at the house babysitting."
Mrs. Allen testified that she first learned about the incident from her husband. "About three or four days later when Carl told me she had accused him of it, I called her on the phone and asked her if Carl done it . . . She said he didn't do it . . . [S]he changed her story before we got off the phone." According to Mrs. Allen, the prosecutrix told Donnie Steward (Mrs. Allen's brother) that the incident occurred between 6:30 and 7:00 p.m. on January 13.
On cross-examination, it was established that Mrs. Allen talked with Lieutenant Shirley Fields of the Tuscaloosa Police Department on January 25, 1979, at approximately 9:50 a.m. concerning the incident. We note the following exchange from the record (R. p. 104):
 "Q At that time and on that date, did you tell him you thought your husband was guilty?
 MR. CORNWELL (Defense Counsel): Your Honor, we object to what she thought.
 THE COURT: I will overrule the objection. He has the right to lay a predicate.
 MR. CORNWELL: But what she thought, anybody coming off the street could say they thought he was guilty.
 THE COURT: Well, he has the right to lay a predicate.
MR. CORNWELL: He can't lay a predicate —
 THE COURT: I say he can and that settles it. I am the judge ruling on the objections in this case. I am the judge trying the case. Overrule, I will overrule the objection.
Q Did you make the statement? *Page 680 
A No."
Mrs. Allen also admitted talking with Lieutenant Fields on March 6, 1979, after the appellant had cut her with a straight razor. Mrs. Allen admitted, without objection, that on that date she told Lieutenant Fields the appellant had said "if I am going to go to prison for rape I might as well go for murder" and that he had threatened to kill her, the prosecutrix and the prosecutrix's mother. Mrs. Allen further admitted, without objection, that the appellant had made the statement to her "because he thought" she was "going to go against him in court." Then, after this testimony had come in without objection, defense counsel objected to the admission of State's exhibit one, which was the actual written statement Mrs. Allen had made to Lieutenant Fields. This statement contained the same information to which she had previously testified.
On re-direct examination, Mrs. Allen testified that she did not believe her husband raped or attempted to rape the prosecutrix.
Lieutenant Shirley Fields testified that the prosecutrix and her mother advised him of the incident on January 21, 1979, and that a warrant was issued for appellant's arrest on January 23. He stated that during his investigation he received information from Donnie Steward concerning the incident. From the record we quote (R. pp. 115-117):
 "Q Did Donnie Steward tell you that [the prosecutrix] had told him of this incident?
A Yes, sir.
 Q And on what date did he say she had told him of that incident?
 MR. SUMMERFORD: We object. Again he is going into the making of the report.
 THE COURT: Sustain the objection. I think that would all be hearsay at this point. Sustain the objection to anything Donnie Steward said or when.
 MR. CORNWELL: Your Honor, may we approach the bench?
 THE COURT: Yes, sir, take the jury back to the jury room, Mr. Sanders.
 (The jury then retired to the jury room out of the presence and hearing of the Court at which time proceedings were as follows:)
 THE COURT: You are asking about a particular statement made, is that right?
 MR. BRASWELL: Yes, sir, it is my understanding of the law regarding statements made by the prosecutrix in a rape case that while the details of the incident she gave are not admissible but the facts and circumstances surrounding the giving of the report are admissible and it would seem to me the Court has limited our ability to go into the making of the report through this witness who is the only witness available to the defense, that Mr. Shirley Fields who is the investigating officer in his capacity in this case did take a statement and Mr. Steward is not available to the State or the defense. He is not within the State of Alabama as I understand it and if we are not allowed to use this witness for that purpose I believe the defense will be severely hampered.
 MR. SUMMERFORD: You are asking if [the prosecutrix] made a report to Donnie Steward. Is that what you are asking?
 MR. BRASWELL: And when she told him of the alleged incident.
 THE COURT: Well, I think that might be all right but I don't think we can go into any details made by Donnie Steward.
MR. BRASWELL: I simply want to fix the time.
MR. SUMMERFORD: Can you show Shirley knows that?
 THE COURT: Go ahead and examine Shirley then. Ask Shirley anything you want to and let's see.
 Q (By Mr. Braswell) Lt. Fields, did Mr. Steward make a statement to you regarding this incident?
A Yes, sir.
 Q When did he tell you [the prosecutrix] first reported this incident to him? *Page 681 
 A He said it was on Sunday after the incident occurred.
Q That would be on the 14th of January of this year?
 THE COURT: This was supposed to have happened on Saturday. I don't think you can go any further beyond that really. I am sorry the other witness is not here. Do you have any idea where he is?
MR. SUMMERFORD: No, sir.
THE COURT: How old a person is this?
MR. SUMMERFORD: Probably twenty-eight, around that.
 THE COURT: I will permit you to go that far with Mr. Fields but I don't think we can go any further unless the State opens it up but I don't think we can go any further into any statement made by him.
 Q Did Mr. Steward tell you that he had seen the prosecutrix shortly after the alleged incident?
MR. SUMMERFORD: We object.
 MR. BRASWELL: Again I believe the circumstances of the making of the report by the prosecutrix would be admissible, Your Honor.
 MR. SUMMERFORD: We object to that. They can only show one when she reported it, complained about the incident and when she reported the complaint.
THE COURT: That is all we can go into.
 MR. BRASWELL: I believe this clearly falls within the verbal acts doctrine. If he saw her shortly after this alleged incident anything he observed in the way of physical acts, her demeanor would be admissible. The digest is full of cases.
 THE COURT: What this witness said about her demeanor?
MR. BRASWELL: Yes, sir.
THE COURT: Overrule the objection.
 MR. CORNWELL: We except. Did you overrule the objection or sustain it.
 THE COURT: I will let him say about that business about the time and that is as far as he can proceed."
While the jury was still retired from the courtroom, Lieutenant Fields was permitted to testify that Donnie Steward had told him that the prosecutrix had told him (Steward) the incident occurred at approximately 6:30 p.m. on January 13. Steward, it must be remembered, had visited the prosecutrix at approximately 7:00 p.m. on the 13th and had seen her crying. When the prosecutrix reported the incident to Steward on the 14th, she used Steward's observation of her crying the day before to lead in telling him about the incident which actually occurred later, at approximately 10:30 p.m. In other words, according to the report Steward made to Lieutenant Fields, the prosecutrix had originally told Steward that the assault had occurred at 6:30 p.m. instead of 10:30 p.m. and used her crying episode at 7:00 p.m. to lead into telling him. The prosecutrix had told Steward that she was crying at 7:00 p.m. because the appellant had assaulted her at 6:30 p.m.
 "MR. BRASWELL: Your Honor, do I understand the Court to be ruling in that the observation of the prosecutrix crying coupled with her later statement that the reason she was crying was because her uncle had just attempted to rape her that the Court will not allow that evidence to come in?
 THE COURT: I am sorry the witness is missing but I just don't know of any rule of law that permits me to let Mr. Fields come in and testify what may have been said. . . . I am sorry this witness is not here really. We could all have some benefit from his
 testimony but I just can't let you reconstruct his testimony from Mr. Fields' testimony. . . ."
. . . . .
 "MR. BRASWELL: We simply want to show that the prosecutrix was viewed by her other uncle, the witness Donnie Steward on Saturday evening about seven o'clock and that she was crying; that on the day following on Sunday she told Donnie Steward she said do you know when you saw me Saturday I was crying *Page 682 
that was because Uncle Carl tried to rape me . . . now if he was at work this thing never happened. That is the gist of our defense. It has been from the beginning and if we are not allowed to show this because the main witness is out of town and because we can't use the police report then the defense is severely handicapped.
 MR. SUMMERFORD: Your Honor, what they are asking for constitutes gross hearsay and nothing else.
MR. BRASWELL: How is it hearsay?
 THE COURT: I say it is hearsay. That settles it. . . . I just cannot allow this testimony to be rebuilt. I am sorry the witness is not here but I can't help it."
. . . . .
 (The jury then returned to the courtroom in the presence and hearing of the Court at which time proceedings were as follows.) (R. pp. 119-124)
Lieutenant Fields then testified that appellant worked at Western Sizzlin from 10:00 a.m. to 9:30 on the 13th.
On cross-examination, Lieutenant Fields testified that on January 25, 1979, Mrs. Allen told him in the appellant's presence that "she believed [the prosecutrix] was telling the truth" and that the appellant had committed the alleged incident. This evidence was admitted over objection for the purpose of impeaching Mrs. Allen's testimony.
The appellant next took the stand in his own behalf. He denied making any advances toward the prosecutrix. He admitted he received a telephone call for the prosecutrix while she was in the bathroom and to later taking the phone away from her and telling "the boy . . . I was going to cut off those late night phone calls."
The appellant then recalled the prosecutrix who testified that on the 14th she told Donnie Steward the reason he saw her crying at 7:00 p.m. on the 13th was because "the kids was hollering and everything and I couldn't get them to be quiet." The prosecutrix denied telling Steward the reason she was crying was because the appellant had tried to rape her at that time. Following this testimony the defense rested. There was no rebuttal from the State.
 I
The appellant first alleges that it was error for the State to ask Linda Allen on cross-examination if she had told Lieutenant Fields she thought her husband was guilty. The appellant maintains the question solicited an opinion from the witness which she was not competent to give.
It must be initially pointed out that Mrs. Allen answered the question complained of in the negative. It has been held many times that even if questions asked on cross-examination exceed the right to a free cross examination, answers to those questions are not harmful if the witness answers in the negative. Barton v. State, 376 So.2d 756, 760 (Ala.Cr.App.), cert. denied, 376 So.2d 761 (Ala. 1979); Hurst v. State,54 Ala. App. 254, 307 So.2d 62 (1974); Bowman v. State, 35 Ala. App. 420, 47 So.2d 657 (1950). Overruling an objection to a question answered favorably to the objector is not prejudicial error.Stephens v. State, 250 Ala. 123, 33 So.2d 245 (1947); Green v.State, 151 Ala. 14, 44 So. 194 (1907). Thus, even if the question had been improper, and we believe that it was not, the negative answer cured any error.
It is our opinion that the objected to question was proper for the purpose of impeachment. On direct examination Mrs. Allen testified that nothing about the appellant's demeanor appeared unusual when he relieved her at the Zippy Mart on the night in question. She further stated that she had no conversation with the prosecutrix when she arrived home and that the prosecutrix did not appear upset or make reference to the incident the next morning. In addition, Mrs. Allen testified that nothing seemed "unusual or strange" in the appellant's and the prosecutrix's relationship "after we all got up" that morning. Mrs. Allen stated that her husband and the prosecutrix only argued about her "smoking" and "talking on the phone." Moreover, Mrs. Allen said that the prosecutrix did not seem "particularly anxious" to leave *Page 683 
the next day and did not mention the incident when she and the prosecutrix were alone, and that the prosecutrix did not seem anxious to be left alone with the appellant when he took her home.
The clear inference from Mrs. Allen's direct examination was that nothing appeared out of the ordinary after the incident took place and that she had no reason to suspect her husband had committed the alleged offense. What she, in fact, told Lieutenant Fields, it was later learned, was inconsistent with this testimony as noted above.
The testimony of a witness may be impeached by presenting proof showing that he has made statements inconsistent with or contradictory of his testimony. Lewis v. State, 44 Ala. App. 319, 208 So.2d 228 (1968). See also C. Gamble, McElroy'sAlabama Evidence, § 155.02 (1) (3rd ed. 1977) for this general rule. "Evidence of such contradictory statements is admitted only to discredit the witness; it is not affirmative evidence of the facts stated." 4 Jones on Evidence, § 932 (5th ed. 1958).
 "It is axiomatic that a witness may be impeached by showing prior statements which are at variance with those deposed at the trial of the cause. The adopted procedure is to lay a predicate to the witness and, if the prior contradictory statement is denied, proof may be made that the witness did make the previous assertion." Jackson v. State, 35 Ala. App. 542, 50 So.2d 282 (1951) citing Bridges v. State, 225 Ala. 81, 142 So. 56 (1932) and People's Shoe Co. v. Skally, 196 Ala. 349, 71 So. 719 (1916).
More specifically, we refer to C. Gamble, McElroy's AlabamaEvidence § 155.02 (2) (3rd ed. 1977) for the following proposition:
 "There is a generally recognized principle, known as the Opinion Evidence Rule, that a witness cannot testify to his opinion but rather must only relate the facts observed by him and allow the jurors to arrive at their own opinions. However, this rule does not prevent impeachment by proof of a previous opinion expressed by a witness that is inconsistent with his present testimony."
We believe this proposition to be correct and applicable in the instant case. Lest we be misunderstood, while it would have been patently erroneous for Mrs. Allen to have been cross-examined as to her present opinion of the appellant's guilt, it was proper for the State to show, for purposes ofimpeachment, that on a past occasion she had expressed such an opinion. This evidence is in no way admissible to affirm the truthfulness of the previously asserted opinion (that the appellant was guilty) but only to show that such previously asserted opinion had been given by the witness and that that previously asserted opinion is at odds with the witness' present testimony. See Bates v. Chilton, 244 Ala. 297,13 So.2d 186 (1943) for an analogous holding.[1]
It cannot be seriously questioned that Mrs. Allen's testimony on direct examination consisted of material facts. It is competent to introduce evidence to impeach witnesses by showing prior contradictory statements made to a material matter.Gentry v. State, 35 Ala. App. 627, 51 So.2d 558 (1951). Mrs. Allen gave explicit and comprehensive testimony concerning the casual demeanor of the prosecutrix and the appellant both prior to and subsequent to the assault. Her testimony concerning their demeanor subsequent to the assault was especially relevant because of the proximity of the assault to her observation and because of the reaction such an assault would naturally be expected to engender in *Page 684 
both the prosecutrix and the appellant. The material as well as central facts to be proved or disproved from Mrs. Allen's observation of their demeanor was, of course, whether the appellant had in fact made the revolting advances toward the prosecutrix, as alleged, or whether nothing out of the ordinary had occurred in Mrs. Allen's absence. This was the central question the jury had to resolve. That Mrs. Allen told Lieutenant Fields after the assault that she thought the appellant had committed the offense is inconsistent with her otherwise innocuous testimony concerning her observations of the prosecutrix's and appellant's behavior soon after the incident. That Mrs. Allen made such an inconsistent statement to Lieutenant Fields was a fact the jury had a right to know.
Thus, while Mrs. Allen's present opinion of appellant's guilt would have in no way been material to the issues or admissible in evidence, the fact that she on a prior occasion asserted her opinion that appellant was guilty was inconsistent with certain material facts she had established on direct examination, and was, therefore, admissible for the sole purpose of impeachment.
 II
Although not raised in brief, we hold that Lieutenant Fields's testimony on cross-examination that Mrs. Allen told him on January 25, 1979 she believed the prosecutrix was telling the truth and that the appellant committed the alleged acts was admissible for the purpose of impeachment as it was inconsistent with the testimony of Mrs. Allen. C. Gamble,McElroy's Alabama Evidence, § 157.01 (1) (3rd ed. 1977) reads as follows:
 "When a witness, on cross examination, denies that he made a statement out of court which is inconsistent with his testimony on direct examination, the only available move for the impeaching party is to bring on an impeaching witness who can testify as to the prior inconsistent statement of the witness being impeached."
See Blackwell v. State, 264 Ala. 553, 88 So.2d 347 (1956); Grayv. State, 56 Ala. App. 131, 319 So.2d 750 (1975) and authority cited.
 III
Appellant contends that the admission of State's exhibit one, the March 6, 1979 statement Mrs. Allen made to Lieutenant Fields, was reversible error. There is no merit to this contention. As noted above, Mrs. Allen admitted to every material fact contained in the statement, without objection, prior to the statement being introduced. Thus, the admission of Mrs. Allen's March 6 statement was harmless at most. It is not error to allow facts to be shown over objection when they have already been proven without objection. Bush v. State, 282 Ala. 134, 209 So.2d 416 (1968); Espey v. State, 270 Ala. 669,120 So.2d 904 (1960).
 IV
The appellant finally argues that the trial court committed reversible error when it refused to allow him to question Lieutenant Fields concerning what Donnie Steward had told him the prosecutrix had said to Steward about the incident. This discussion from the record is fully set out above. What Steward told Lieutenant Fields that the prosecutrix told him is rank hearsay and was properly excluded. Had Steward been available as a witness his testimony possibly could have shed light on this matter, but such is not the case before us. We find no error in the trial court's ruling.
We have carefully examined this record and find no error therein. The judgment of the trial court is due to be and the same is hereby affirmed.
AFFIRMED.
All the Judges concur.
[1] In Bates v. Chilton, 244 Ala. 297, 13 So.2d 186 (1943) a county witness testified in a condemnation proceeding that certain land was just as valuable after the taking as before; the court held that the landowner was then entitled to prove, by asking the witness on cross-examination, whether the witness had previously asserted his opinion that the running of the highway through the land was "literally going to ruin them." It was specifically recognized in Bates, supra, that such evidence was admissible for the purpose of impeaching the credibility of the witness. 13 So.2d at 189. *Page 685