PATTERSON, Judge.
Appellant, Grady Carr, Jr., was convicted of arson in the second degree following a trial by jury. See Ala. Code (1975), § 13A-7-42. Appellant was sentenced as a habitual offender to a term of twenty-five years in the penitentiary and ordered to pay restitution in the amount of $24,925.79.
The State’s evidence at trial was entirely circumstantial. Ms. Willie Mae Alford testified that on January 15, 1984, she owned and operated the Riverside Community *715 Grocery Store (hereinafter referred to as “store”) on Eugene Street in Montgomery, Alabama. Sometime after 10:00 p.m. that night, a building located behind the store was burned. Alford lived in an apartment located in this building. Expert testimony established that the fire was intentionally set and that a flammable liquid applied to the door of the building ignited the fire. Samples of the earth removed from the area of the fire’s origin indicated the presence of gasoline.
The circumstances leading to appellant’s arrest for the arson of this building began during the afternoon of January 15, 1984. Alford testified that she and appellant had been romantically involved until about three months prior to January of 1984. Appellant continued to visit the store and threaten her “as usual.” During the afternoon of January 15, appellant came into the store “high” and “raving” at Alford. Appellant accosted Alford’s sister, who threw an ashtray at him. Alford asked appellant to leave and eventually appellant did leave. Alford then contacted the police and signed a warrant alleging harassment.
Appellant was released from the Montgomery City jail after posting bond. Appellant returned to the store between 9:00 and 10:00 p.m., and questioned Alford as to why she signed the warrant. Alford told him it was because he would not leave her alone. Alford then testified that appellant stated he “would blow the store up and would burn me up.” Alford closed the store between 9:30 and 10:00 p.m. Alford was afraid appellant would return, so she went to her sister’s house for the night rather than stay in her apartment located in the building behind the store. Later that night Alford was contacted by a neighbor, who informed her of the fire. The building and its contents were determined to be a total loss.
Ms. Laura Stoudemirs lives near the store and was among the first to observe the fire. Stoudemirs testified that she needed a loaf of bread and was going to purchase it at Alford’s store, but the store was closed when she arrived. Stoudemirs testified that she saw appellant’s motorcycle parked in front of the store at that time. Stoudemirs walked to another store to purchase the bread and, when she returned, appellant’s motorcycle was still parked in front of Alford’s store. A short while later, Stoudemirs noticed smoke emanating from behind the store and appellant’s motorcycle was gone.
Ms. Debra Hatchett, Alford’s niece, testified that she was present when appellant returned to the store that evening. Hatch-ett testified that appellant “said he was going to blow the store up and blow us up in there, too.”
Ms. Martha Turbin testified that she was present when appellant returned to the store that evening, but that she did not hear any specific threats.
Appellant testified at trial that he returned to the store after bond was posted on the harassment warrant in order to retrieve his motorcycle. Appellant went inside to get his helmet and asked Alford “why she did it.” Appellant stated that Alford’s relatives started throwing things at him and Alford pushed him out the door. Appellant stated that he then got on his motorcycle and returned home, where he remained for the evening.
Appellant contends that the trial court erred in refusing to allow him to introduce evidence of self-contradictory statements made by Alford during a preliminary hearing held on January 29, 1984. Appellant’s attorney taped the preliminary hearing and this tape is before us as part of the record. At the preliminary hearing, Alford testified as follows:
“Q. ... Okay, all right, you said he came back and wondered why he was in jail. What did you tell him and what happened?
“A. I was trying to tell him that to help him and me also, but he just didn’t see it that way. So he just got into a big argument. He just told me he was going to do the worstest dirtiest something....
“Q. Well, what did_
*716 “A. That he could do ... that he could do to me.
“Q. The worst dirtiest something he could do to you, did he ever tell you anything specific that he might do? Did he ever tell you exactly what he might do?
“MR. FLACK: Objection, your Honor. Putting the words in the client.
“COURT: Overruled.
“Q. (By Mr. Perry): Go ahead, you can answer that.
“A. Not exactly.
“Q. Not exactly ... When did he ... You remember about any time about what time he made this statement?
“A. I sure don’t.
“Q. O.K., when?
“A. It was after he come.
“Q. What did he do after he made that statement to you?
“A. Well, its like he got in a rage. I went to him and asked him would he go on out the door, but he still stood up and told me what all that he was going to something, something dirty.
“COURT: Well, what did he say he was going to do. Did he say anything ... specific?
“A. Not anything specific.
“Q. (By Mr. Perry) O.K.
“A. And I went to him and asked him would he go on out the door, pulled him like this ... asked if he would go on.
“Q. And what did he do?
“A. He went on.”
At trial Alford testified on direct examination as follows:
“Q. And this was after you signed the warrant?
“A. This was afterwards.
“Q. Okay. Did he make any threats to you at that time?
“A. He just told me that he would get me.
[[Image here]]
“Q. He told you that he had just gotten out of jail?
“A. Yes, he did.
“Q. And at that time, what, if any, threats did he make toward you?
“A. He asked me why did I do that. “Q. Meaning to sign a warrant?
“A. Why did I sign a warrant and put him in jail.
“Q. What did you tell him?
“A. I told him because he wouldn’t leave me alone.
“Q. Okay. What did he say to you? “A. He told me that’s okay, I’ll get you. “Q. Did he say specifically what he was going to do to you?
“A. He said in the store that ... that he would blow me up. And he would blow the store up and he would burn me up, but it just so happened that I didn’t go behind there that night.”
On cross-examination Alford testified as follows:
“Q. Mrs. Alford, do you remember making statements in January on the 29th, 1984, when we had a preliminary hearing in this case?
“A. Uh-huh (positive response).
“Q. Do you remember telling the Judge and telling me and telling the prosecutor at that time that Grady Carr never made any specific threats against you?
“A. No, I don’t remember that.
“Q. Would you like for me to refresh your memory? If I played it back on tape, would you be able to tell me if that is your voice?
“A. I might could. I might not could....”
The State then requested a hearing out of the presence of the jury on appellant’s attempt to play the tape. The trial judge, in chambers, listened to the tape and concluded that there were “absolutely no inconsistent statements” contained in the tape. The court refused to allow appellant to use the tape in order to impeach Alford’s testimony-
Our review of the evidence convinces us that the tape recording of the preliminary hearing conclusively reveals self-contradictory statements made by Alford. Thus, appellant should have been allowed to *717 present this evidence to the jury for their consideration.
The Attorney General contends that appellant failed to lay the proper predicates required for the introduction of impeachment testimony and for the admission of a sound recording. Extrinsic evidence of a prior inconsistent statement may be offered for impeachment purposes where the impeaching party establishes the proper predicate. This predicate is established by “asking the party being impeached whether he made such statement, specifying with reasonable certainty the time when, the place where, the person to whom such supposed statement was made and the substance of such statement.” C. Gamble, McElroy’s Alabama Evidence § 157.01(1) (3d ed. 1977). See also Bridges v. State, 225 Ala. 81, 142 So. 56 (1932); Thigpen v. State, 355 So.2d 392 (Ala.Cr.App.), aff’d, 355 So.2d 400 (Ala.1977); Arnold v. State, 339 So.2d 616 (Ala.Cr.App.1976). These requirements were properly met by appellant before he attempted to introduce the prior inconsistent statements. If a proper predicate has been laid, proof may be made by others that the witness made the self-contradictory statements whether the witness denies having made them or merely states that he does not remember whether or not he made them. McElroy’s, § 157.03; Edwards v. State, 279 Ala. 371, 185 So.2d 393 (1966); Gray v. State, 56 Ala.App. 131, 319 So.2d 750 (1975); Lawson v. State, 36 Ala.App. 438, 57 So.2d 643 (1952).
The Attorney General correctly points out that the predicate for the admission of sound recordings was not established by appellant. See Voudrie v. State, 387 So.2d 248 (Ala.Cr.App.), cert. denied, 387 So.2d 256 (Ala.1980). The trial court erroneously ruled that the sound recording did not contain any self-contradictory statements and disallowed the recording on that basis. Appellant was never afforded the opportunity to establish this predicate afterwards and an attempt to do so obviously would not have affected the judge’s ruling. If, upon retrial, appellant offers the sound recording into evidence, he must establish the proper predicate for its admission.
The testimony of Alford at trial concerning threatening statements made by appellant constituted very damning evidence against appellant, considering the. totality of the evidence offered by the State. For this reason, we cannot hold that the error was harmless. The trial court erred to reversal in finding that Alford made no self-contradictory statements at the preliminary hearing. Appellant should have been allowed to use these self-contradictory statements to impeach Alford’s trial testimony once the proper predicates were established.
The remaining issues raised by appellant are either without merit or not likely to arise upon retrial of this cause. We therefore pretermit discussion of these remaining issues. This case is due to be, and it is hereby, reversed and remanded.
REVERSED AND REMANDED.
All Judges concur.