[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1187 
Appellant was convicted of murder in the first degree and the jury fixed his punishment at imprisonment in the penitentiary for life. Throughout the trial proceedings appellant was represented by counsel of his choice and at arraignment pleaded not guilty. After sentence was imposed he gave notice of appeal. He was found to be indigent and was furnished a free transcript. Trial counsel represents him on this appeal.
Omitting the formal parts the indictment reads:
 "The grand jury of said county charge that, before the finding of this indictment, Robert Edward Chambliss, alias R.E. Chambliss, alias Bob Chambliss, whose true name is to the grand jury otherwise unknown, unlawfully and with malice aforethought killed Carol Denise McNair by perpetrating an act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, by, to-wit: setting off or exploding *Page 1188 
or causing to be set off or exploded, to-wit: dynamite or other explosive, to-wit: at, under, or dangerously near, to-wit: the Sixteenth Street Baptist Church in Birmingham, Jefferson County, Alabama, during to-wit: Sunday morning church worship services or other Sunday morning church activities in the said church and while the said Carol Denise McNair was within said church, and as a proximate result thereof, unlawfully killed the said Carol Denise McNair, against the peace and dignity of the State of Alabama."
The sufficiency of the evidence is raised by a motion to exclude the State's evidence, assigning several grounds, a request for the affirmative charge, and a motion for a new trial. The trial court overruled the motions and refused to give the affirmative charge. This puts us to a recital of the evidence.
This case grew out of the September 15, 1963, bombing of the Sixteenth Street Baptist Church in which four young black girls were killed and a number of other people injured as a result of the blast which left the church in shambles. The community, the state and the nation were stunned and shocked by this dastardly act. Local, state and federal law enforcement agencies all took part in the investigation of this crime. Piece by piece the evidence was assembled which led to the indictment of appellant in September of 1977. The evidence in this case is circumstantial and the passage of time presents many complex problems which we must resolve.
 Summary of the Evidence
Reverend John Haywood Cross was pastor of the Sixteenth Street Baptist Church on Sunday, September 15, 1963, when the explosion occurred. The Sunday School hour began at 9:30 a.m. Just before the explosion Reverend Cross was in the Women's Bible Class which was meeting around the center of the auditorium toward the Sixteenth Street side of the church building. He was standing near a window with the picture of Christ as the Good Shepherd.
At about 10:21 a.m. an explosion went off. It sounded to Reverend Cross like the whole world was shaking and he thought the church was going to collapse. After the explosion he raised his head and observed the glass had fallen, plaster from the walls and ceiling had fallen, there was a great deal of dust, and soot; and it was so smoky and dense that he had a difficult time recognizing people who were three feet away from him. He identified State's Exhibit M as a photograph depicting a window near where he was sitting when the explosion occurred.
When Reverend Cross had collected his thoughts he yelled to the people in the church, "Get out hurriedly," as he thought there might be another explosion. He then thought about the children downstairs and made his way to the stairs leading to the lower auditorium. He found the stairs on the Sixteenth Street side of the church building had been completely demolished. He had to go to the other side of the building to use the staircase on the west side. Once downstairs and outside the church he saw the same damage downstairs that he had seen upstairs. Plaster, soot, dust and pictures which had been knocked from walls were scattered in every direction. Injured people were standing around outside in a dazed condition and many were bloody.
Reverend Cross identified State's Exhibits B through O as fourteen photographs which accurately depicted the scene at the church immediately after the explosion. These photographs were introduced into evidence. He identified State's Exhibit C as a crater which he observed after the explosion. Prior to the explosion there had been a solid wall at that place with three and a half to four feet of mortar and brick installed at the foundation level. The blast from the explosion blew out the brick and stone wall.
He further testified there were seven or eight Sunday School rooms downstairs and he carefully checked each of them to see if anyone was trapped in them but found no one in these rooms. After checking these rooms he went outside and saw people being loaded into ambulances, and other ambulances *Page 1189 
were being called. He saw several people with blood trickling down their foreheads. He spoke to the crowd of people and urged them to be orderly and forgiving.
Reverend Cross then went and looked around the side of the church building and saw a large hole in the wall of the building on the Sixteenth Street side. The hole was so large that he could walk inside by just bowing his head. He entered the church through that hole and was followed by three persons from the Civil Defense group. The group started digging under the debris and rubble caused by the explosion. After digging about two feet deep they found the body of a young girl. They continued their search and found the bodies of three other young girls. The four bodies were found almost in the same location as if they had been thrown on top of each other. Reverend Cross knew and identified each of the four bodies and stated these four young girls had attended church that morning. They were Addie Mae Collins, Cynthia Wesley, Carol Robertson, and Carol Denise McNair.
Reverend Cross identified photographs of the four bodies taken at the scene of the explosion and at the coroner's morgue. The photographs taken at the morgue were in substantially the same condition as the bodies appeared when they were removed from the church except the bodies were unclothed and the blood had been removed. These photographs were introduced into evidence.
Reverend Cross further testified that after the four bodies had been removed from the church they continued their search. Within minutes they heard moans and groans a few feet away from where they were searching. They went into that area and found Sara Collins who had been trapped in the rest room area of the building. She was trapped in one of the ladies rest room stalls. Blood was trickling down her cheeks and she was littered with dust, plaster and other debris. Sara Collins, who survived the explosion, was a sister of Addie Mae Collins whose body had been found earlier.
According to Reverend Cross one hundred and fifty to two hundred people were in the church at the time of the explosion. Approximately sixty percent of these people were young children. Twenty-two church members were injured as a result of the explosion. Reverend Cross' youngest daughter, age three, was struck by flying glass that hit her in the head and forehead. He further stated that during the month of September, 1963, there had been no guards, either private or police, keeping watch on the church.
Sara Collins (Riley) was a member of the Sixteenth Street Baptist Church on September 15, 1963, and on that Sunday she attended church with her family, including her sister Addie Mae Collins. At that time she was ten years old. After Sunday School, she was in the ladies lounge located in the basement of the church. Also in the lounge at that time were the four young girls who were killed. At the time of the explosion she was at the lavatory washing her hands. The four other girls were standing by the window of the lounge talking. The last time she saw her sister, Addie Mae, was when Addie Mae was tying Denise McNair's sash on her dress. Immediately after the explosion Sara Collins (Riley) called her sister several times but Addie Mae did not answer.
After the explosion Sara Collins (Riley) was carried to the hospital. She was blind for about a month. Eventually, her right eye had to be removed, and it was replaced with a glass eye.
The Assistant Fire Marshal of the City of Birmingham, William E. Berry, testified that, on the morning of September 15, 1963, he heard the explosion at the Sixteenth Street Baptist Church. He was at home at the time which is 3.4 miles from the church. He went to investigate the scene of the explosion. He approached the church on Sixth Avenue North, headed west, from the Seventeenth Street intersection. He parked his car in the sixteen hundred block about 150 feet from the intersection and walked toward the church. He observed the street was littered with debris, broken *Page 1190 
glass, mortar, rocks and dirt. The building directly across the street from the church had a window blown out and glass was all over the street. He identified State's Exhibits F, L, K, N, and O as photographs which accurately depicted that building and the surrounding scene as he observed it that morning.
Captain Berry also observed several cars in the street that were heavily damaged. The vehicles had large dents in them, broken windows, and holes which protruded inward. These vehicles had greater damage on the sides which were closer to the church. State's Exhibit A was identified as a photograph accurately depicting Sixteenth Street looking north and it was admitted into evidence.
As he approached the church that morning Captain Berry saw a crater or hole outside the church building. The crater or hole was where a stairway had been before but it had been blown away. There was a hole in the side of the church at grade level and broken windows were scattered everywhere. The hole in the side of the church was immediately adjacent to the crater which was next to the wall of the church. The crater was on the outside of the church where the church wall had been. The ground came to the wall at a higher level than the floor on the inside. The wall which had been blown away was constructed of masonry. Captain Berry identified State's Exhibit C as a photograph accurately depicting the crater and what was left of the church wall. He also identified State's Exhibits B, D, E, I, and M as photographs accurately showing the scene inside the church as he observed it that morning.
Captain Berry had formal and intensive training in high grade explosives, including dynamite explosives. He attended Technical Ordnance School in the United States Army in 1954, a school for ordnance disposal which dealt with home-made bombs and military explosives. He attended a similar United States Army School in 1957. He attended several explosive schools conducted by the State of Florida. He also attended a school on arson and explosive devices which was conducted under the direction of the University of Purdue in Indiana. He had considerable personal experience with surface dynamite explosions. The trial court ruled that Captain Berry was an expert.
Captain Berry testified that he determined that the immediate area of the explosion at this church was the crater which he found at the scene and where the greatest degree of destruction was found. He stated that the breaking of the brick and stone wall, the digging of the ground, and the pulverizing of the dirt at the crater area are very common to a high-grade explosive which is detonated on the surface. He said that dynamite is a high explosive. Based upon his formal training, his experience and his personal inspection of the crater, Captain Berry determined that the explosion had been on the surface.
Captain Berry further stated that, based upon his formal training, experience, study, and his investigation at the scene, the explosion at the church was not caused by natural gas explosion; that natural gas explosions of any type were really a flash of fire through an area, which blows at the weakest point — that is the perimeter or outer edges of a building or structure. At the bombed church Captain Berry found that the explosion had the most destructive force concentrated at its center which was the crater. The destructive force of the explosion had diminished as it went out.
Captain Berry further stated that he determined that the explosion was caused by a high explosive such as dynamite. He said the noise of the blast was consistent with a dynamite explosion. In addition, he recognized the odor he smelled at the scene as the odor produced by a dynamite explosion, an odor he had smelled many times before. Dynamite ranges from twenty percent to seventy percent in strength with seventy percent being the most destructive. Captain Berry stated that twenty percent to sixty percent would be a normal commercial grade in dynamite. He did not know, of course, the strength of the dynamite which was used in the explosion at the Sixteenth *Page 1191 
Street Baptist Church, and, not knowing its strength, he could not say how many sticks of dynamite were used in the explosion. He did state that, based upon his knowledge and experience, if forty percent dynamite was used, then at least ten sticks or more of dynamite were involved in the explosion. He also stated that there was a lot of dynamite "floating" around north Alabama in the late 1950's and early 1960's.
Captain Berry testified that dynamite could be detonated chemically, electrically, mechanically, or with a burning safety fuse. He also stated that it was possible to construct a detonation device which would delay the explosion of dynamite for an extended period of time, even for hours. He said he did not know what method of detonation was used in the explosion of the church in this case. An extensive search was made at the scene in an attempt to find the detonation device which was used. However, when a detonation device is connected to the explosive itself, it is extremely rare to find any trace of such a device after the explosion. Finally, Captain Berry said that he had personally searched for detonating devices thirty to forty times but he had found only one and that was a spring from a clock device.
Dr. Joe Donald is a general surgeon in Birmingham. On September 15, 1963, he was the chief resident in surgery at the Hillman Clinic which is now the University Hospital. His qualifications as an expert in medicine and general surgery were stipulated.
On the day of the church bombing he examined the bodies shown in the photographs designated as State's Exhibits P, Q, R, S, and T. Dr. Donald testified that those photographs accurately depicted the bodies of the four young girls which he examined on September 15, 1963, except that when he first saw the bodies they had clothes on them. He examined the bodies of the four girls and pronounced them dead upon arrival at the hospital.
Dr. Donald stated that the injuries which he saw on the body of Denise McNair were abrasive and detonating type injuries. The tissues were lacerated. He concluded that the cause of death of Denise McNair was a concussion or percussion type injury. He said that based upon his knowledge and experience the injuries that he viewed on the bodies of the four young girls were consistent with having been received by the force of an explosion.
J.O. Butler, Sr. was Coroner of Jefferson County on the day of the bombing. His duties included the investigation of all homicides and suspicious deaths in Jefferson County, and his duties required him to investigate many deaths during his tenure of office. On September 15, 1963, he received a call to report to Hillman Hospital to investigate some deaths. When he arrived he found a waiting room had been converted into a temporary morgue. He identified State's Exhibits P through T as photographs of the four bodies which he examined on that occasion.
The coroner identified State's Exhibit S as a photograph of the body of Denise McNair. Her body was identified to him by her father and mother who were present at the temporary morgue. Reverend Cross was also present. Mr. Butler stated that the photograph truly and accurately portrayed the condition of Denise McNair's body and the injuries she sustained as a result of the explosion. He testified that the major injury to her body was a one and a half inch fracture of the skull and also there were numerous lacerations and abrasions. He stated that the injuries and wounds which he saw and examined were calculated to and did in fact cause her death.
Mr. Butler identified a photograph of the body of Carol Robertson who was identified to him by her father. He stated that the body had multiple lacerations and fractures of the head, chest and arms. He identified a photograph of the body of Addie Mae Collins whose body was pointed out to him by the victim's sister, Judy Collins. He also identified the body of Cynthia Wesley whose father was present at the time. The body of this victim had to be identified from rings and clothes on the body because *Page 1192 
the upper part of the body was so badly mutilated that it was hardly recognizable.
Mr. Butler concluded his testimony by saying that the injuries received by the four young girls were in his best judgment calculated to, and in fact did, cause their deaths. All photographs were admitted into evidence over appellant's objections except as to the one depicting the body of Denise McNair.
W.L. Allen was the Chief Deputy Coroner for Jefferson County, and on September 15, 1963, he was Deputy Coroner of said county. His duties included the investigation of homicides, accidental, suicidal, and unexplained deaths. Mr. Allen identified State's Exhibits U, V, W, and X as records about the incident that happened on September 15, 1963, which were kept in the Coroner's Office. He identified Exhibit U as the coroner's report on the investigation of the death of Denise McNair which was kept in his custody and control as Chief Deputy Coroner. The State offered Exhibit U into evidence and the Court sustained appellant's objection thereto.
At the close of Mr. Allen's testimony, the State offered Exhibits X, Y, Z, and AA as the official, certified, sworn copies of the death certificates of the four victims. Appellant objected and pointed out that the four death certificate exhibits contained a blank which said, "describe how injury occurred," and the blank spaces were filled in with the words "dynamite blast" or "dynamite blast-bomb." Appellant's counsel, referring to these entries, told the Court that if these entries were blocked out he would have no objection to the introduction of the death certificates into evidence. The trial judge ruled that the death certificates could not go to the jury until the statements as to the cause of death were censored out. Thereupon, the Court cut out the part concerning the cause of death and the death certificates were admitted into evidence. The judge then instructed the jury not to put any significance on the fact that the four death certificate exhibits had a hole in them.
Jewel Christopher McNair is the father of Carol Denise McNair. She was eleven years old at the time of her death and was an only child.
At approximately 8:45 a.m. or 9:00 a.m. on the day of the church bombing Mr. McNair and Denise had a conversation at home while they were getting ready to go to church. Mr. McNair attended St. Paul Lutheran Church and Denise attended the Sixteenth Street Baptist Church. Denise wanted to know why her father could not wait until she got ready before he left. He told her he had to go and start Sunday School since he was the Sunday School Superintendent. She responded, "Okay, Daddy, go ahead." This was the last time he saw her alive. The next time he saw her was at Hillman Hospital where he identified her body. He identified a photograph exhibit as a picture of Denise as she looked when he identified her body.
Thomas H. Cook is a retired Birmingham policeman. He retired in 1976. He was never assigned to investigate the church bombing in this case, and he did not take any part in that investigation. Mr. Cook has known appellant over a period of years. Appellant formerly worked for the City of Birmingham and Mr. Cook was acquainted with him at that time.
In December of 1975 Mr. Cook had a conversation with appellant at a hardware store in North Birmingham where appellant was employed. On that occasion, he and appellant got into a discussion concerning incidents of bombings that had occurred in the Birmingham area. Mr. Cook went to the hardware store in response to a telephone call he received from appellant in which appellant asked Mr. Cook to come by and talk with him. The bombing of the Sixteenth Street Baptist Church came up in their conversation. Mr. Cook asked appellant if he had any idea who would have enough nerve, or guts enough, to do anything like that. Appellant replied, "Well, you know I got arrested for having that dynamite." Appellant mentioned "that dynamite" while they were discussing the church bombing. Appellant told Cook that he gave the dynamite to "Rowe and them." *Page 1193 
On cross-examination Mr. Cook stated that appellant was referring to Tommy Rowe. Mr. Cook reported his conversation with appellant to Captain LeGrand and Sergeant Cantrell a few days later and "told them exactly what Mr. Chambliss told me."
Sergeant E.H. Cantrell was employed with the Birmingham Police Department on September 15, 1963, and is now an Administrative Sergeant. He stated that he knew Robert Chambliss by sight and by reputation. In November of 1976 Cantrell had a conversation with appellant in the Birmingham City Hall building. The conversation took place after appellant voluntarily went to the Police Department to talk with officers about a man named Don Luna. Don Luna had supplied information to Colonel Al Lingo, Chief of the State Department of Public Safety, upon which appellant had been arrested for possession of dynamite in September of 1963.
Don Luna had been arrested shortly before appellant went to the Police Department in November of 1976 to talk about Luna. The arrest of Luna was not related in any way to the church bombing. His arrested involved securities violations. Luna's arrest had been published in the news media and a reporter for the Birmingham News called and said appellant wanted to talk to the police about Luna. A short time later appellant voluntarily appeared at the Birmingham Police Department to talk about Luna.
Sergeant Cantrell had a discussion with appellant in November of 1976 in the presence of Captains LeGrand and Myers. The discussion lasted about an hour and during the major part of that conversation appellant just sat and talked to the officers. During this conversation appellant brought up the subject of dynamite. Appellant told the officers that Don Luna called him and asked him to go to Leon Negron's store and get some dynamite. Appellant said he did go to Negron's store and got some dynamite on September 4, 1963. He mentioned a case of dynamite to the officers and later in this same conversation he mentioned an opened case of dynamite.
Appellant told the officers that the dynamite he purchased from Leon Negron's store in September of 1963 was to be used to blow up some stumps preparatory to building a klavern hall — "that is a meeting building, or meeting hall, of some sort of the Ku Klux Klan." Appellant further stated to the officers that he got the dynamite, a box of caps, and a roll of fuses, and carried all of this home in the trunk of his automobile. Appellant told the officers at the time he got the dynamite he told Leon Negron why he wanted it. Appellant said that Negron stated to him, "If you're going to blow up some niggers, I will throw in a few extra sticks for it." He told the officers that his wife had turned over the dynamite which he purchased to a Johnny Hall and Charles Arnie Cagle.
During this same conversation with the officers appellant got into a discussion concerning the construction of bombs. He said, "A fellow told me how to make a bomb by using a drip method. You use a bucket of water, a fishing bobber, with a hole in the bottom of the bucket." Captain LeGrand asked appellant who told him this and he replied that he did not remember. Appellant did not tell the officers how such a bomb device would work. Sergeant Cantrell had never seen a bomb of that type, but he had heard of it before. During this conversation in November of 1976 appellant made a statement in regard to the bombing of the Sixteenth Street Baptist Church. He said, "They thought that I bombed the church. If I had bombed the church I would have put enough stuff there to flatten the damn thing."
On cross-examination Sergeant Cantrell testified that on the night of September 14, 1963, he was on patrol duty from 11:00 p.m. until 7:00 the next morning. His patrol beat that night included the bombed church and extended from Twentieth Street North in the East to Center Street in the West, and from Division Avenue in the South to Tenth Avenue in the North. No other patrol cars were assigned to that same area, but there were other cars in the area that night. *Page 1194 
Sergeant Cantrell had instructions to pay as much attention to the Smith Motel, the Gaston Motel, and the Sixteenth Street Baptist Church as possible when time permitted. He was not specifically assigned to guard these locations, but he checked them when he got time away from his other patrol duties that night. He estimated that he went by each of the three locations once each hour and it could have been a little less. He checked by just riding by these places. He did not see or hear over his police radio any report of anything unusual nor any suspicious white men in the area of the bombed church during his tour of duty on the night of September 14, 1963. He was called away from his patrol that night by run-of-the-mill calls.
Cantrell further testified that to his knowledge there were no other regular patrol units assigned on a time available basis to patrol the area around the church and the motels when time permitted. However, there was a special car assigned to patrol the church and the two motels. He stated that at approximately 1:35 on the morning of September 15, 1963, there was a call to the special car patrolling that area and this call took the special car out of service. The call concerned a bomb threat at the Holiday Inn Motel which is about six blocks from the Sixteenth Street Baptist Church.
Captain Jack LeGrand has been with the Birmingham Police Department for twenty-seven years. He testified concerning the conversation which he and Sergeant Cantrell had with appellant. He stated that on the date of that conversation he received a call from Andrew Kilpatrick of the Birmingham News. Kilpatrick told Captain LeGrand that Robert Chambliss, appellant, wanted to give LeGrand some information on a person by the name of Don Luna. LeGrand later received another telephone call from Mr. Kilpatrick advising him that Chambliss was en route to the Major Felony Squad Office and would be there in a few minutes. Chambliss arrived shortly thereafter.
Captain LeGrand had no conversation with Chambliss before he called Sergeant Cantrell. Neither LeGrand nor anyone in his presence or hearing threatened Chambliss, offered him any reward or hope thereof, or coerced or intimidated, or promised him anything to induce him to give the officers any statement or even say anything to the officers. Captain LeGrand did not arrest or attempt to arrest Chambliss and he was not told that the officers had any evidence on him. Chambliss was not in custody and was not detained in any fashion. He was free to leave at any time after he voluntarily came to the Police Department. The conversation with Chambliss lasted about an hour and during that period of time Chambliss did eighty-five percent of the talking. Chambliss rambled back and forth about things that would come to his mind. Captain LeGrand was present during the entire conversation with Chambliss.
Ms. Elizabeth H. Cobbs is a licensed minister in the Methodist Church and lives in Birmingham. She is pastor of the Deuman Memorial Methodist Church. She became a minister two years prior to appellant's trial. Appellant is her uncle by marriage, having married Ms. Cobbs' mother's sister.
Before the explosion at the Sixteenth Street Baptist Church on September 15, 1963, appellant, in Ms. Cobbs' presence, made many statements of hatred or ill will towards black people as a racial group. School had opened just before the time of the explosion at the church, and there was quite a bit of disruption during the attempted integration of the local schools. Mr. Chambliss had taken part in some of the demonstrations at local schools. Appellant told Ms. Cobbs that he was helping to stop integration in the schools and that he was attempting to preserve white supremacy and to keep the "niggers" in their place. On many occasions appellant said that in order to do that he would do "anything possible." Appellant told Ms. Cobbs that he was a member of the Ku Klux Klan and that he became a member in order to fight to maintain segregation and to keep the "niggers" in their place.
On Saturday, September 14, 1963, the day before the church bombing Ms. Cobbs had a *Page 1195 
conversation with her uncle, appellant, in his house in Birmingham. She went by his house on her way to work that morning to check on her aunt who had not been feeling well. Ms. Cobbs entered the kitchen of the Chambliss home and sat at the kitchen table to talk with her aunt. Appellant was also seated at the kitchen table. The morning newspaper carried a story about an incident in which a fourteen year old white girl had been cut by a young black male the evening before. Ms. Cobbs had gone to school with the white victim's older sister and she brought the subject up at the kitchen table that morning. When Ms. Cobbs brought the subject up Mr. Chambliss became very angry and agitated and began cursing. He then said that he had been fighting a one-man war since World War II, and that if anyone had backed him up they would have had the "G.d. Niggers" in their place by now. The article in the newspaper had mentioned that a prominent figure had offered a $100 reward for the capture of the young black male who had committed the crime. Appellant then told Ms. Cobbs if that man could offer a $100 reward that he would offer a $1,000 reward. According to the testimony of Ms. Cobbs the young black male was subsequently apprehended and jailed.
Ms. Cobbs stated that appellant continued to make angry and profane remarks against blacks in general and repeatedly said that if anyone had backed him up — if the boys had backed him up — that they could have had the blacks in their place by now. Appellant then left his home to get an issue of the newspaper. He returned shortly with the newspaper and read it at the kitchen table. Appellant started cursing and swearing again very loudly and angrily. He stated that if he had been there when the incident took place that "nigger" would not have gotten away. He also stated that he had gotten the name and address of the "nigger" girl that was going to integrate the school.
Ms. Cobbs testified that she cautioned appellant against doing anything foolish and he told her not to worry, that if he did anything he would be in something that he could get away in. He also told Ms. Cobbs in the same conversation, which took place the day before the church bombing, "that he had enough stuff put away to flatten half of Birmingham." Appellant further said that the F.B.I. or police could pick him up and search him all they wanted to, but they wouldn't find the "stuff" unless he pointed it out to them.
After appellant told Ms. Cobbs that he had enough "stuff" to flatten half of Birmingham she asked him what good he thought that would do. Ms. Cobbs stated that appellant placed his hand on the newspaper and "He looked me in the face and said, `You just wait until after Sunday morning, and they will beg us to let them segregate.' I asked him what he meant, and all he would say was, `Just wait. You will see.'" Ms. Cobbs further stated that when appellant made that statement to her, "He was very intense. He was threatening and intimidating."
On the Saturday evening following the bombing at the Sixteenth Street Baptist Church Ms. Cobbs was again in the house of her aunt and uncle, the appellant. Ms. Cobbs was sitting on the sofa in the living room and appellant was sitting on the opposite end of the sofa watching television. The news broadcast concerning the explosion at the church came on television. The broadcast mentioned the possibility of murder charges growing out of that bombing and appellant said, "It wasn't meant to hurt anybody. It didn't go off when it was supposed to." It appeared to Ms. Cobbs that appellant made this statement to the television announcer as he was still looking at television.
Ms. Cobbs stated she had given this identical information to the F.B.I. in 1963 and the same information to Alabama law enforcement officers in August of 1977.
William Jackson has been a resident of the Birmingham area since 1962. He is a barber by trade. He is an acquaintance of appellant and came to know him in 1963. In the early part of September, 1963, Mr. Jackson went to appellant's house because *Page 1196 
he was interested in joining the Ku Klux Klan. Mr. Chambliss told Jackson that someone would get in touch with him. Approximately two weeks later Mr. Jackson was contacted by Thomas E. Blanton, Jr.
On the Sunday preceding the explosion at the Sixteenth Street Baptist Church, Mr. Jackson saw appellant at a meeting at the Cahaba River Bridge on Highway 280 South. According to Jackson the purpose of the meeting was to get together twenty-five men so that a klavern of the Ku Klux Klan could be organized. Appellant and Tommy E. Blanton, Jr. were in charge of the meeting. At this meeting there was talk about the way Bobby Shelton was operating the Klan, and there was a discussion about the Klan dragging its feet.
The night before the explosion at the church Mr. Jackson saw appellant at the Modern Sign Company on Third Avenue North in Birmingham. That location is approximately eight blocks from the church that was bombed the next morning. Also present with appellant that night was Thomas E. Blanton, Jr. The group at the Modern Sign Company were engaged in making Confederate flags and anti-integration bumper stickers. Appellant arrived at the sign company about 8:15 that night and Mr. Jackson left after 10:30 p.m.
Mrs. Gertrude Glenn was born in the Birmingham area but has lived in Detroit, Michigan since 1929. Every year she returns to Alabama to visit friends during her two weeks vacation. She returned to Alabama in 1963 and on September 14 and 15, she was visiting a friend named Louise Hall who lived at 1521 Seventh Avenue North. That address is across the alley from the Sixteenth Street Baptist Church.
In the late hours of Saturday night, September 14, or the early morning hours of Sunday, September 15, 1963, Mrs. Glenn left Mrs. Hall's residence to drive a friend, Ms. Katherine Willis, to her home in West End. She drove Ms. Willis in her 1962 DeSoto automobile. She returned to Mrs. Hall's residence and arrived in front of it on Seventh Avenue at about 2 o'clock on Sunday morning. It was about eight hours before the explosion at the church.
When Mrs. Glenn returned she was driving on Seventh Avenue North between Fifteenth and Sixteenth Streets. While looking for a parking place Mrs. Glenn noticed a parked car with its dome light on. This car was parked about midway the block between Fifteenth and Sixteenth Streets. She first noticed the parked car when she was about two car lengths away from it. It was parked on the right side of the street, the same side that Mrs. Glenn was driving on while looking for a parking space.
Mrs. Glenn noticed that the parked car had a long aerial on the back on the left side. The aerial was so long Mrs. Glenn thought the car had a telephone in it. The car was fuchsia and beige in color and was a Chevrolet. She did not notice the tag or the tag number. She did not notice any type of identifying marks on the Chevrolet except the year model, the color and the unusual type of antenna on it. She paid particular attention to the car because the dome light was on. At the time she noticed the car she was driving slowly, "Creeping along," looking for a parking place. She looked into the parked car as she passed it. She saw two white men in the front seat of the car and this frightened her because no white people lived in that neighborhood. She wondered what the two white men were doing in that neighborhood at that time of the morning. The place where the white men were parked was more or less behind the church which was bombed eight hours later and just across the alley from it.
Mrs. Glenn did not get a good look at the man on the driver's side of the parked car because he was not facing her and he just glanced around and immediately turned back. She did get a good look at the man who was sitting on the right or passenger side of the front seat of the parked car. He was facing her and as she slowly passed the parked car he looked directly in her face. She looked directly at him. At this time her automobile was right beside his and she was driving very slowly — just inching along. She almost stopped. Her automobile lights were on high beam and the street *Page 1197 
lights were on. The dome light in the parked car remained on. Mrs. Glenn got a "real good look" at the white man on the passenger side of the parked car. She parked her car about two or three car lengths in front of the car occupied by the two white men. She got out of her car and ran into the house — she "flew in there." After entering the house and closing the door she looked out through the glass part of the door at the car with the two men in it. She saw it leave. The car turned left on Sixteenth Street towards Eighth Avenue. The car made a left turn even though it was on the right hand side of Seventh Avenue.
After the explosion at the church the next morning Mrs. Glenn saw the same car again. She saw it going up Seventh Avenue North two or three times and it was moving real fast.
Two months after the explosion two F.B.I. agents brought a book of photographs to Mrs. Glenn in Detroit. They came to her house once and to her place of employment twice. The agents showed her a book of photographs which contained pictures of people and cars. It was a big book and contained numerous photographs. The agents told Mrs. Glenn that someone had given them information that she knew something about the church bombing in Birmingham. They requested her to look through the photographs. The agents did not suggest any particular photograph for her to identify, nor did they tell her they had a suspect in the case or that anyone had been arrested. Mrs. Glenn picked out photographs of the man and the car that she saw parked with the dome light on as she passed it looking for a parking place at 2:00 a.m. on Sunday, September 15, 1963, and these were the same photographs that she identified at trial. The photographs she picked out were two of appellant.
About a month before the trial Attorney General Baxley and Chief Investigator Jack Shows went to Mrs. Glenn's home in Detroit to talk to her about the case. They brought a great number of pictures with them and again Mrs. Glenn picked out appellant's photographs as the white man she saw face to face sitting on the passenger side of the automobile across from the bombed church at 2:00 a.m. on the day of the explosion. Mrs. Glenn was always shown a group of photographs without any suggestion as to which one she should pick out. On no occasion did she ever fail to pick out the same photographs which she identified at trial.
At trial Mrs. Glenn identified State's Exhibits BB, CC, and DD as photographs of the automobile she had seen with the dome light on parked on Seventh Avenue North behind and across an alley from the church at 2 o'clock on the morning of the explosion. She also identified the car in those photographs as the one she saw rapidly driving on Seventh Avenue several times after the explosion later that day.
At trial Mrs. Glenn identified State's Exhibits EE and FF as photographs of the man she saw sitting in the front seat on the passenger side of that car when it was parked just behind and across the alley from the Sixteenth Street Baptist Church at 2 o'clock the morning of the explosion. She also testified that, except for the fact that these two pictures had been cut apart, they were the exact same photographs she had picked out when the F.B.I. agents came to see her two months after the explosion. Exhibits EE and FF are photographs of appellant.
Jack Shows, the Chief Investigator of the Attorney General's Office at the time of the trial, had been investigating the Birmingham church bombing since 1971. He interviewed Mrs. Glenn for the first time approximately nine or ten months before trial at which time he carried many photographs for her to look through. Neither Shows or anyone in his presence suggested to Mrs. Glenn any particular picture to pick out. He identified State's Exhibit A as the packet of photographs he exhibited to Mrs. Glenn. He identified Exhibits EE and FF as photographs which she picked out. These were photographs of appellant. One did not have a police number on it but the other one had such a number. *Page 1198 
The packet of photographs which Shows showed Mrs. Glenn contained thirty-six photographs of white males in addition to the photographs of appellant. The photograph of appellant was not the only one which had police numbers below it. Approximately seven of the photographs had police numbers under them. Four of the photographs had "Birmingham" on them. Mr. Shows got the photographs in the packet from Bob Eddie, an Investigator who worked under him. All of the photographs were of people who had been under investigation in this case or related cases, and all of their names had been tied together.
When Mr. Shows first interviewed Mrs. Glenn he asked her to look through the packet of photographs and see if she could identify the man she saw in the car parked on Seventh Avenue the night shortly before the explosion on September 15, 1963, the man she had picked out for the F.B.I. The photograph which Mrs. Glenn picked out for Mr. Shows in 1976 was the same photograph which she had identified for the F.B.I. agents in 1963.
Timothy Michael Casey, Jr., was a member of the F.B.I. for twenty-eight years. At the time of his retirement ten years before this trial, he was the Senior Resident Agent in New Hampshire. In 1963, he was assigned to Birmingham as part of the investigation into the bombing of the church resulting in the death of four young black girls. He was in Birmingham about a week after it happened and stayed in Birmingham for approximately three months. The F.B.I. sent more than fifty agents to Birmingham in a special detail to work on the church bombing.
Part of Agent Casey's assignment was the surveillance of Mr. Chambliss off and on during the time he was in Birmingham. He interviewed Chambliss at the F.B.I. Office on one or two occasions. Agent Casey identified State's Exhibits EE and FF as photographs of Robert Chambliss the way he appeared in 1963. Mr. Casey got to know Thomas E. Blanton, Jr., during this time. During his surveillance of Chambliss Mr. Casey saw Chambliss and Blanton together once in a while. He said he believed he saw them together at Chambliss' house on one or more occasions.
Mr. Casey had occasion in 1963, in the course of his investigation, to observe the car that Blanton drove. He identified State's Exhibits BB, CC, and DD as the automobile which Thomas Blanton was driving in Birmingham at that time. Mr. Casey testified that he was present when those three photographs were taken, and they had been retained in the file of the F.B.I. during the investigation.
After the testimony of Mr. Casey the State offered into evidence Exhibit GG, a certified copy of the 1964 tag registration for Thomas E. Blanton's 1957 model Chevrolet automobile. The tag number on that registration is visible on the photograph of State's Exhibit DD.
Yvonne Young was a resident of the City of Birmingham at the time of appellant's trial. Prior to September 15, 1963, she lived in Bessemer, Alabama. Her name at that time was Yvonne Lavelle Fike. Prior to September 15, 1963, she was introduced to Robert Chambliss by a man named Ross Keith. Prior to that date she had seen Chambliss at some of the rallies and had been in his home on two occasions. About two weeks before the church bombing she was at Robert Chambliss' home. She and Keith had been out riding a motorcycle and Keith told her he needed to go to Chambliss' house on some business, and she went with him. It was midday when they arrived at the Chambliss house. Present at the time were Chambliss, his wife and another man. They stayed at the house for about an hour.
While she was there the three men left the room and she and Mrs. Chambliss stayed in the den or living room. Mrs. Young asked Ross Keith how to get to the rest room. She started to the rest room, but went to the wrong door. She opened the door and Chambliss started cursing. He scolded her as though she "was a child that had done something real bad." Chambliss told Keith that the door was supposed to have been locked and that he knew not *Page 1199 
to direct her to that door. Chambliss was angry.
The room which Chambliss was in had a wood floor and there were some things on the floor. The things on the floor were three or four bundles. There were four or five articles to the bundle, and each bundle was tied with a cord, "like you would fix a package to mail." The articles in the bundles "looked like oversized firecrackers." They were between a beige and a brown in color, the same color as masking tape. After Mrs. Young saw the bundles, and was cursed out by Chambliss, she closed the door to that room and went to the bathroom. When she left Chambliss' house, about thirty minutes later, he was still mad. This occurred approximately two weeks before the explosion at the church.
Mrs. Young stated she had been confined to the psychiatric ward at the University Hospital at her own request for three or four weeks in 1964, and had received shock treatments. She further testified that she told the F.B.I. in 1963 exactly what she was stating in court. She said as long as she had been questioned about it, she had told the same story.
She further said that she had not been informed by any member of the Attorney General's staff or any investigator from that office, or any police agency at all that there was a reward outstanding in the case. All she knew about any reward was what she had read in the paper. Concerning the reward Mrs. Young stated, "That's blood money, and I want no part of it."
Aaron Rosenfeld is a retired Fire Marshal of the City of Birmingham. He was the Fire Marshal from 1951 to 1972. From 1944 until 1951 he worked in the Birmingham Fire Prevention Bureau, and worked with the Fire Marshal.
Mr. Rosenfeld had formal training in organic chemistry when he was in college at the University of Alabama. During a part of 1930 and 1931 he worked with a wrecking crew and was involved with dynamiting. He had considerable experience with dynamite blasts since the wrecking crew dynamited almost every working day. Prior to September 15, 1963, Mr. Rosenfeld was associated with other dynamite blasts on many occasions. He also had formal training in explosives at Army schools, some training at the University of Alabama, and the University of Purdue. He had personally discharged dynamite, had heard dynamite exploded, seen it, observed it, and smelled it on various occasions.
On September 15, 1963, he was on duty as Fire Marshal of the City of Birmingham. He was in an area west of the Birmingham Airport around 10:20 or 10:25 that morning when he heard a big explosion. He recognized the kind of explosion he heard as he had heard the same type of explosion so many times. He stated that from the sound it was a detonation. After the explosion he got in his car and swiftly drove to his office and then went to the scene at the Sixteenth Street Baptist Church. When he arrived he noticed that the stairway which had formerly been on the side of the church facing Sixteenth Street was gone, except some remnants. He observed a big hole in the wall of the church and some glass had been blown out and was across the street. There were some automobiles at the scene that had some body damage. He went toward the hole in the wall of the church and saw that part of the building wall next to the hole in the ground was blown out. The hole in the ground was on the outside of the church, and the church wall had been blown inward all the way against the other wall of the church.
Mr. Rosenfeld got into the crater caused by the explosion. He got some dirt from the bottom of the crater and smelled it. He identified the smell in the crater as dynamite.
John McCormick is a special agent with the F.B.I. He had been an F.B.I. agent for twenty-three years and at the time of appellant's trial was stationed in Spartanburg, South Carolina. He had attended schools in explosions and bombings conducted by the F.B.I. in Quantico, Virginia. He had taken courses with DuPont which company manufactures dynamite. These courses involved dynamite and dynamiting. During his *Page 1200 
training and duties with the F.B.I. he had been around many dynamite explosions.
On September 15, 1963, Agent McCormick had been in Birmingham for about a week investigating another bombing incident. He was staying at the Bankhead Hotel. About mid-morning on that date he heard a loud explosion which shook the windows in the hotel. It appeared to come from some place near the hotel. He called his office and was immediately dispatched to the church on Sixteenth Street. Fifteen minutes later he was at the church. McCormick stated that dynamite has a distinctive odor; a gas explosion does not have the same type of odor as a dynamite explosion. Plastic explosions, explosions of Nitro glycerin, and explosions of ammonium nitrate do not have an odor. He stated that when he breathes fumes from dynamite explosions he gets a severe headache. He said that when he arrived at the church he detected the distinct odor of dynamite and he developed a headache.
Upon arriving at the explosion scene Agent McCormick inspected and searched the area. He observed a large crater-type hole which was several feet across. The crater was in the ground directly on the outside of the building. The entire section of the wall where, apparently a window had been, was completely inside the church building. There was very little debris on the outside of the building except glass. Most of the debris was on the inside of the building. The entire mesh screening was entirely on the other side of the wall of the room, immediately adjacent to the hole.
He further testified that, during his training and experience, he had learned that one could determine whether an explosion had gone off inside or outside a building by observing the debris which was left after the explosion. McCormick stated that had the explosion gone off inside the church, instead of outside, large chunks of the wall would have been on the outside and debris would have been blown towards the street rather than towards the inside of the building.
A small fishing bobber with a wire attached to it was found at the scene. McCormick was present when another F.B.I. agent found the bobber and it was picked up in his presence. McCormick had the fishing bobber in his hands for a short period of time and he examined it carefully. The wire attached to the bobber was not a fishing wire. The wire, which was bare, was not as flexible as a fishing line, and it was a little more sturdy. No other fishing equipment was found anywhere near the scene. The fishing bobber with the attached wire was found on the street about twenty feet from the explosion crater. There was some grass around the area but the fishing bobber was by itself. The bobber was made out of plastic but it was not cracked or dented. It appeared to be intact.
Agent McCormick further testified that, based upon his experience and training in dealing with explosives, and with dynamite in particular, a light object immediately above the explosion would fly through the air and might not be damaged at all. He stated that he investigated an explosion scene in Spartanburg, South Carolina, where an explosion had gone off near fishing tackle. At that explosion, which was under a trailer, the trailer had been blown completely apart. The explosive device had been placed under the middle bedroom of the trailer, and there was fishing equipment in the trailer directly above the dynamite blast. The fishing equipment, which included fishing bobbers, was found all around the scene and was intact. Most of the fishing bobbers were not even cracked.
McCormick stated that he did not know what happened to the fishing bobber which was found at the scene after the explosion at the church. He did not know the name of the F.B.I. agent who recovered the bobber, but he knew he was an agent because he had seen him around the Birmingham office during the short time many of the agents were in Birmingham on special assignment. McCormick had seen a report which mentioned the fishing bobber during his investigation. He said he did not personally send the fishing bobber to the F.B.I. *Page 1201 
laboratory, and he had no personal knowledge that it was actually sent.
Appellant's counsel asked that the State produce the fishing bobber during the trial. Attorney General Baxley told the court that the State did not have, and had never had, the fishing bobber found at the scene. He further told the court the F.B.I. said they did not have it. The Attorney General said that the records showed that the fishing bobber was picked up and sent to the F.B.I. laboratory, but the F.B.I. records showed that it was not received.
It was stipulated between counsel for both sides that Lewis Negron, Ross Keith, and Clarence Dill were dead. The exact times of their deaths were unknown but they died between the date of the church explosion and appellant's trial. The Attorney General informed the trial court that some witnesses for the State had also died and that he wished those witnesses could be present also.
At the conclusion of Agent McCormick's testimony the State rested its case in chief.
We will now summarize the evidence adduced on behalf of appellant.
Billy D. Webb is a Lieutenant in the Birmingham Police Department. On the night before the church explosion he was employed in the patrol division. He went on duty on September 14, 1963, at 11:00 p.m. and was off duty at 7:00 a.m. on September 15, 1963. He was assigned to a detail working in the area of the Sixteenth Street Baptist Church. His assignment required him to check the church, the Birmingham Police motor pen on Third Avenue and Fifteen Streets, the Holiday Inn on Third Avenue, and the A.G. Gaston Motel. He and his partner spent the entire shift patrolling their assigned area, covering some four or five blocks. He and his partner tried to give roughly equal protection to the four separate locations to which they were assigned to check that night. From time to time they actually parked their patrol car at or near each of the four locations. The general pattern was to drive from one location to the other and spend a little time at each.
Lieutenant Webb did not remember any radio calls which took them away from their assignment. He did not recall seeing any unusual or suspicious white men at any point during the night in the area they were patrolling. He did not recall how long at a time he actually saw the Sixteenth Street Baptist Church that night. He estimated that he and his partner did not give the church a total of two hours' observation during the entire shift. He admitted that he had no idea where he and his partner were on the morning of September 15, 1963, at 1:45, or at 2:00, or at 2:15. He further admitted that he had no idea whether or not Robert Chambliss was sitting in a car with the dome light on in front of 1521 Seventh Avenue at approximately 2:00 a.m. that Sunday. Although he did not see Chambliss there, Chambliss could have been there for all he knew.
There was a regular patrol car in the same area in addition to Webb and his partner that night. The other car was not on a special assignment, but was performing its regular patrol duties. There were other police cars in the area but Webb did not know the number.
Sergeant Paul Hurst was Lieutenant Webb's partner that night and his testimony was substantially the same as Webb's, but he did not remember whether or not he saw any white men on foot in the area of any of the locations they were assigned to protect that night.
Floyd C. Garrett was employed as a police officer for the City of Birmingham in September of 1963. Robert Chambliss is his uncle. Garrett's mother is Chambliss' sister.
On the morning of September 15, 1963, Garrett's wife came in the room and got him out of bed to answer a telephone call from police headquarters. This was some time before noon. Garrett testified that after talking to police headquarters he went to the home of Robert Chambliss at 2505 32nd Avenue North. He said he went to Chambliss' home to see if Chambliss had a shotgun that he could borrow. When Garrett *Page 1202 
arrived at Chambliss' home he found Chambliss was playing dominoes with a man named Dill. Dill was dead at the time of appellant's trial. Garrett said that Chambliss did not have a shotgun, and after he left Chambliss' home he reported for duty with the police department.
Garrett testified that he knew Detective Maurice House. He said he could not remember whether or not he talked to Officer House in the Detective Bureau on the afternoon of September 15, 1963. Garrett stated that he did not tell Captain House and Detective Hart on the afternoon of September 15th that he had gone by Robert Chambliss' house that morning before coming on duty because he was suspicious that Chambliss might be involved in the bombing and wanted to see if he was at home.
Garrett further testified that he did not recall Chambliss saying when he arrived at Chambliss' home that morning, "What's the matter? more nigger trouble, or bombing?" Garrett could not recall whether he told F.B.I. Agents Timothy Casey and Bernard Cashdollar on October 2, 1963, that when he arrived at Chambliss' home that morning and asked to borrow a shotgun that Chambliss made that statement. Garrett admitted that he could have told those agents that Chambliss made that statement but he didn't remember whether or not he told them that.
Garrett stated that he was positive that when he went to Chambliss' house on the morning of the explosion that he did not tell Chambliss, "They will get your _____ on this one. You have gone too far."
Appellant offered the testimony of nine friends, neighbors and a former policeman who testified that his general reputation in the community was good. One of these witnesses admitted that he knew Chambliss belonged to the Ku Klux Klan.
Mrs. Bennie Mae Brown is the sister of appellant. She testified that on the morning of the explosion at the church she went to her brother's house. She went to see Mr. Dill, who always worked on her car, to see why her car was making a noise. Mr. Dill lived next door to her brother. She said her brother and Mr. Dill were playing dominoes. As she was going to her brother's house she saw Floyd Garrett. She was at her brother's house between 11:00 a.m. and noon that Sunday.
Appellant offered into evidence certified copies of the warrants and complaints charging Robert Chambliss with possession of dynamite, the charge having been made on October 9, 1963, together with the jury verdict of not guilty.
A portion of the psychiatric and medical records of Mrs. Yvonne Young was offered and admitted into evidence as Defendant's Exhibit Two. The remainder of her records was offered and admitted as State's Exhibit II.
Edward Thilt Walker is retired from Magic City Dodge and Liberty Motors, a Chrysler Motor Company dealership. Mr. Walker was employed by this company and its predecessor for thirty years. He testified that the last model year in which Chrysler made DeSoto automobiles was in 1961.
On rebuttal the State called Maurice House who worked for the Birmingham Police Department for thirty-three years prior to his retirement. He retired with the rank of Captain of Detectives.
Captain House testified that he knew Robert Chambliss' nephew, Patrolman Floyd Garrett, and that he knew him in September of 1963. Captain House stated that in the middle of the afternoon of September 15, 1963, he saw Garrett at headquarters and had a conversation with him. He said that Garrett told him that he had gone to Chambliss' house because he was suspicious that Chambliss might have been involved in the bombing. On cross-examination Captain House testified that Garrett told him he had gone by Chambliss' house to see if he was at home, and that he found the defendant was at home.
Captain House further testified that he had known Robert Chambliss since 1958, and that prior to September 15, 1963, Chambliss had a bad general reputation in the community. Captain House also said *Page 1203 
that prior to September 15, 1963, Robert Chambliss' general reputation in the community for turbulence and violence was bad.
Appellant filed a motion to quash the indictment on the ground that his constitutional rights were violated because of the long delay between the time the crime was committed and the time he was indicted. This is a due process claim and it is equated to the Sixth Amendment right to a speedy trial.
In United States v. Marion, 404 U.S. 307, 92 S.Ct. 455,30 L.Ed.2d 468, the Supreme Court held that the Sixth Amendment right to a speedy trial applies only to delays that occur after a prosecution has formally begun. In this case there was no inordinate delay between the indictment and the date appellant was tried. There is no contention otherwise.
There is no constitutional right to be arrested at an early date or at any particular time. United States v. Marion, supra;United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044,52 L.Ed.2d 752; Hoffa v. United States, 385 U.S. 293,87 S.Ct. 408, 17 L.Ed.2d 374.
Preindictment delay lies solely within the statute of limitations and the Due Process Clause. There is no statute of limitations in Alabama for murder. Section 15-3-5, Code of 1975. Thus the Due Process Clause must be resolved. This clause has a limited role to play in protecting against oppressive delay. The Due Process Clause requires that the accused establish that because of the preindictment delay his trial was rendered so unfair that it violated those "fundamental conceptions of justice which lie at the base of our civil and political institutions," and which define "the community sense of fair play and decency." United States v. Lovasco, supra.
It is not preindictment delay per se that offends the Due Process Clause but there must be resulting prejudice to the defendant which strikes at the heart of fair play and justice. But the Due Process Clause "does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining `due process,' to impose on law enforcement officials our `personal and private notions' of fairness and to `disregard the limits that bind judges in their judicial function.'" United States v. Lovasco, supra.
Before the dismissal of an indictment because of delay can be sanctioned the defendant must prove that the delay actually prejudiced him in his defense. United States v. Marion, supra;Crawford v. State, Ala.Cr.App., 342 So.2d 450; United States v.Butts, 5 Cir., 524 F.2d 975; United States v. Mays, 9 Cir.,549 F.2d 670.
A defendant must not only prove that the preindictment delay prejudiced him, but he must also prove that the resulting prejudice was substantial. Crawford v. State, supra; Arnold v.McCarthy, 9 Cir., 566 F.2d 1377; United States v. Catano, 5 Cir., 553 F.2d 497.
A real possibility of prejudice will not suffice, actual prejudice must be shown, and cannot be presumed. Crawford v.State, supra, makes clear that the delay must be purposeful, unreasonable, and prejudicial to the accused. It cannot be seriously contended that the delay in this case was intended, or that the State sought an advantage by the delay. Appellant's claim of prejudice is based on the intervening death of several prospective witnesses, yet there was not even an attempt to show in the trial court how the unavailability of these witnesses or the loss of physical evidence had a devastating effect upon or even harmed his defense. He freely concedes that "speculation as to what these witnesses might have said is in vain."
Arnold v. McCarthy, supra, holds that the assertion that a missing witness might have been helpful does not establish the actual prejudice required by the decision of the United States Supreme Court in Marion, supra. Proof of actual prejudice due to the loss of witnesses must be "definite and nonspeculative." *Page 1204 
Even a casual examination of the record shows beyond peradventure that appellant failed to carry the burden on the preindictment delay issue. During the trial it was stipulated that Clarence Dill, Louis Negron, and Ross Keith were dead at the time of trial. Appellant offered no proof as to when Negron and Keith died. For aught appearing in the record they could have died within a day or two after the crime occurred on September 15, 1963. The record shows that Dill died some time after September 25, 1963, ten days after the crime, but exactly when he died was never established. Appellant failed to show that any of these three witnesses was alive at the time that the most quickly returned indictment could have been tried. The trial judge made it clear to appellant that a ruling on his motion to quash on grounds of pretrial delay would be held open and "with the understanding that if additional information, material thereto, develops on the trial, the defense will refile a motion to quash." Appellant could have secured death certificates showing precisely the dates of deaths of these witnesses, but he neglected to do so. Thus, he failed to carry his burden of proving actual prejudice in his defense resulting from the delay to bring him to trial.
Appellant has not alleged that the prosecution of this crime was deliberately delayed for the purpose of gaining a tactical advantage over appellant at trial. A calculated delay hurts the prosecution just as much as the defense. Since the prosecution in a criminal case has the burden of proving its case beyond a reasonable doubt, and to a moral certainty, dimmed memories, lost evidence, and unavailable witnesses have a special impact on the burden cast upon the prosecution. In the light of the presumption of innocence, and the burden of proof, no prosecutor could reasonably believe that a thirteen or fourteen year delay in a case would improve the chances for a conviction. A conviction was gained in this case in spite of the long delay.
As the Court said in United States v. Lovasco, supra, "The decision whether to prosecute, therefore, required a necessarily subjective evaluation of the strength of the circumstantial evidence available and the credibility of respondent's denial. Even if a prosecutor concluded that the case was weak and further investigation appropriate, he would have no assurance that a reviewing court would agree. To avoid the risk that a subsequent indictment would be dismissed for preindictment delay, the prosecutor might feel constrained to file premature charges, with all the disadvantages that entails."
The Supreme Court of the United States said in Hoffa, supra, and quoted in Marion, supra:
 "There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."
In December of 1975, during a discussion of racial violence that occurred in Jefferson County, Officer Cook asked appellant if he had any idea who was responsible for the bombing of the Sixteenth Street Baptist Church. Appellant replied, "Well, you know I got arrested for having that dynamite."
Less than a year before he was indicted appellant made some extremely incriminating statements to Sergeant Cantrell of the Birmingham Police Department. Appellant admitted that he purchased some dynamite for the Ku Klux Klan on September 4, 1963, just eleven days before that church was bombed. While appellant told Officer Cantrell the dynamite was to be used to blow up some stumps, he did admit that the person from whom he bought the dynamite told him, "If you're going to blow up some *Page 1205 
niggers, I will throw in a few extra sticks for it." Appellant also told Cantrell that if he had bombed the church, "I would have put enough stuff there to flatten the damn thing."
In that same conversation appellant told Cantrell that he knew how to make a bomb by using a drip method by the use of a bucket of water and a fishing bobber as a timing device. Not only did appellant admit buying dynamite for use by the Klan a few days before the crime, but he admitted knowing how to construct the very bombing device which the prosecution had reason to believe was used at the church. Prosecutorial concern over the sufficiency of the evidence is a valid justification for preindictment delay. Arnold v. McCarthy, supra.
The prosecution in this case should not be faulted by the failure of the F.B.I. to cooperate with the State officials. Gertrude Glenn provided the F.B.I. with crucial information a few months after the church bombing but it was not until 1977 that State investigators located and interviewed her. Elizabeth Cobbs testified that while she told the F.B.I. what she knew in 1963, she didn't provide officers of the State of Alabama or the City of Birmingham with any information until August of 1977.
In any event, since appellant failed to prove that he was prejudiced by the delay, the reason for the delay is of no consequence. In United States v. Marion, supra, the Supreme Court recognized that absent proof of actual prejudice there was no need for further inquiry. The fact that appellant was finally brought to trial does not run afoul of those "fundamental conceptions of justice which lie at the base of our civil and political institutions."
Appellant contends the trial court erred in overruling his motion to quash the jury venire. This was an oral motion and was made to the trial court on the morning before the trial commenced. At the conclusion of the oral motion appellant's counsel stated that it will be submitted to the State in writing. No written motion appears in the record on this appeal.
The jury which tried appellant came from a venire which was selected in compliance with the requirement of Act No. 247, Special Session, Acts of 1932, as amended by Act No. 1204, Regular Session, Acts of 1975. Section 14 of this local act applicable to Jefferson County provides:
 "[N]o person must be selected who is under nineteen or over seventy years of age."
It was stipulated that persons over seventy years of age were excluded from the jury venire in this case and the exclusion was pursuant to this provision of Act No. 1204. This local act is no longer in effect. It was superceded by Act No. 594, Regular Session, Acts of 1978, which is codified in the 1975 Code as Sections 12-16-55 through 12-16-64.
Appellant contends that Act No. 1204, and the jury selection process mandated by it, unconstitutionally deprived him of his Sixth Amendment right to trial by an impartial jury, because there were no persons over seventy years of age on the jury venire from which his jury was selected.
A motion to quash is the proper method to raise the question of systematic exclusion. Thomas v. State, 277 Ala. 570,173 So.2d 111. In order for such a motion to become a part of the record on appeal it must have been filed in writing in the trial court. Under the pronouncement in Williamson v. State,52 Ala. App. 617, 296 So.2d 241, the motion was not preserved for review.
An issue involving the constitutionality of a venire from which there has been systematic exclusion of certain groups must be submitted to the trial court in writing before the trial begins. This rule of law was settled by the Supreme Court in Ex parte State ex rel. Attorney General, in re EugeneWilliams, 342 So.2d 1328. In the above case the Supreme Court went on to say that a failure by the defendant in a criminal case to raise in the prescribed manner an objection to the composition of a petit jury on the constitutional ground of the jury selection process constituted a *Page 1206 
waiver of his right to do so. This rule was made applicable to all cases in which the trial commenced after the date of the certificate of judgment in that case. The decision in that case was rendered on February 25, 1977, and the rule announced applied, in all respects, to the trial of the instant case which began on November 14, 1977.
Based upon the foregoing we decline to review the systematic exclusion issue which was not submitted to the trial court in writing before trial.
Appellant asserts that the trial court erred in overruling his objections to questions propounded to F.B.I. Agent McCormick concerning an explosion he investigated in South Carolina where a fishing bobber had survived intact. Appellant's first objection was sustained. His next objection was overruled because McCormick was held by the trial court to be an expert witness. His third objection was to the following question:
 "Q. Tell about that explosion around fishing equipment in South Carolina, that you went to the scene on, what you found in reference to fishing bobbers —"
The objection, though not specific, was, apparently, based on prejudice to appellant. Appellant's fourth objection was to a question which was withdrawn before it was answered. Appellant's last objection was to the following question:
 "From your experience and education and background in dealing with explosives and dynamite, in particular, can you explain to the Court and the jury how an explosive could go off around a light weight floating-type object and not destroy it?"
The grounds of the objection were that it was leading, assumed a fact not in evidence, and, apparently, that it was prejudicial.
Appellant's first objection was sustained, and there being no adverse ruling nothing is presented for review. Robinson v.State, Ala.Cr.App., 342 So.2d 1331; Henry v. State, 57 Ala. App. 383, 328 So.2d 634. The question objected to as leading called for McCormick's expert opinion. Whether leading questions will be allowed is within the sound discretion of the Court and that discretion will not be reversed absent an abuse. Jones v.State, 292 Ala. 126, 290 So.2d 165; Palmore v. State, 283 Ala. 501, 218 So.2d 830; Ray v. State, 248 Ala. 425, 27 So.2d 872. An objection to a question which is withdrawn before answered is harmless. Kemp v. State, 278 Ala. 637, 179 So.2d 762;Ellenburg v. State, Ala.Cr.App., 353 So.2d 810.
The Court overruled appellant's objection to the question asked Agent McCormick as to the effect of an explosion on a light or heavy object. This was a hypothetical question and called for an expert's opinion. McCormick had qualified as an expert on explosives and their effect on light objects. It was in the sound discretion of the trial court to permit the question and answer. Barfield v. Wright, 286 Ala. 402,240 So.2d 593; Wilson v. State, 195 Ala. 675, 71 So. 115.
Finally, appellant complains that the Court erred in overruling his objections to questions posed to McCormick as to what was found at the South Carolina explosion. The answers to these questions indicated that a fishing bobber located just above the explosion was intact and not damaged in any way. However, in re-cross examination appellant also inquired as to the South Carolina explosion.
From the record:
 "Q. Do you know what the fishing tackle in North (sic) Carolina was in?
"Do you know what that fishing tackle was in?
"A. Yes.
"Q. What was it in?
"A. It was under the bed.
 "Q. Was it contained within anything, or was it lying loose?
 "A. It was apparently lying loose, because we found pieces of it, some of it, embedded in the mattress.
 "Q. Up under the bed. And you would have expected to have found pieces of a tackle box, if it were in a tackle box, would you not?
 "A. Yes. I don't recall offhand if we did find any tackle box around there. *Page 1207 
 "I recall the fishing equipment in particular, for a certain reason.
"Q. When did that happen?
 "A. This happened approximately four years ago, in Spartanburg, South Carolina, in the investigation that we were working."
Appellant went into the particulars of the explosion testified to by McCormick to a greater extent than did the prosecution. The questions posed by appellant concerning the same event and the testimony covering the same explosion rendered any error caused by the prior admission of testimony concerning the South Carolina explosion harmless. Yelton v.State, 294 Ala. 340, 317 So.2d 331; Pitts v. State, 291 Ala. 136, 279 So.2d 119.
Appellant contends the trial court committed reversible error in overruling his objection to a reference made by Captain Berry, a Birmingham Fire Marshal trained in explosives, to "charges and bombs" that he had encountered during his career. The reference of which complaint is made consisted of the following:
"A. May I explain this:
 "I have run into charges and bombs in this city that did not detonate. On some of them it was my duty —"
Captain Berry was merely explaining that he had come into contact with only two types of timing devices during his investigations in Birmingham. There was certainly no attempt to connect appellant with any other crimes involving explosives. He was showing the basis for his opinion as to timing devices in connection with the explosion at the Sixteenth Street Baptist Church.
The determination of the relevancy of this testimony properly rested in the trial court's discretion: "`Relevancy has a broad scope in criminal trials.'" Strickland v. State, Ala.Cr.App.,348 So.2d 1105; Bryant v. State, 49 Ala. App. 359,272 So.2d 286. The testimony of Captain Berry clearly meets the requirements of relevancy.
There was no error in allowing the State to elicit testimony regarding appellant's membership in the Ku Klux Klan. Appellant bases his argument on the case of Russell v. State, 27 Ala. App. 10,165 So. 256, but we think such reliance is misplaced. InRussell, defense counsel attempted to impeach certain prosecution witnesses by showing their membership in the same secret society as the complaining witness. The purpose of the attempt was to show prejudice or bias on their part. The trial court refused to allow such testimony and the case was affirmed on appeal wherein the Court held:
 "The affairs of the secret fraternal society inquired about were in no manner involved in this case, and the rule of evidence providing that bias, interest, or prejudice of a witness may be shown by competent evidence cannot be extended as here attempted."
And further:
 "It needs no extended discussion to emphasize the impracticability of a rule of evidence of this character. We judicially know of the thousands of fraternal, religious and political societies and organizations of this, and of every other civilized country; and if the rule of evidence here insisted upon prevailed, this character of inquiry would unquestionably be injected into a large majority of every case tried in the courts. The question here involved was foreign to any issue on the trial of this case."
Appellant's own niece, and one of his character witnesses, testified that he was a member of the Ku Klux Klan. There was other testimony to the same effect. This testimony was elicited, without objection, to show the possible motivation of appellant for bombing a church whose members were predominately black.
Evidence of appellant's membership in an organization such as the Ku Klux Klan, which espouses white supremacy and racial hatred, certainly furnishes a possible motive for the church bombing. The motive for a homicide is always a proper subject of inquiry and proof. Brothers v. State, 236 Ala. 448,183 So. 433; Balentine v. State, Ala.Cr.App., 339 So.2d 1063; Bynum v.State, Ala.Cr.App., 348 So.2d 804. *Page 1208 
In cases where, as here, the evidence is circumstantial, a wide range of testimony is admissible to show the motive of defendant for committing the crime charged. Turner v. State,224 Ala. 5, 140 So. 447; Harden v. State, 211 Ala. 656,101 So. 442.
In a case where the evidence is circumstantial, evidence of motive becomes of great importance. Harden v. State, supra;Hardy v. State, 51 Ala. App. 489, 286 So.2d 899. When circumstances point to the guilt of an accused, evidence of his motivation, even though weak, is admissible. In McClendon v.State, 243 Ala. 218, 8 So.2d 883, the Supreme Court said:
 "`When it is shown that a crime has been committed and the circumstances point to the accused as the guilty agent, then proof of a motive to commit the offense, though weak and inconclusive evidence, is nevertheless admissible.'"
Appellant's membership in the Ku Klux Klan evidenced his hatred of black people and his willingness to resort to violence to vent his ingrained feelings toward that race. His criticism of this proof goes to its weight and credibility rather than to its admissibility.
Appellant contends that the court erred in allowing the introduction into evidence the photographs of the four victims of the church bombing. He claims the photographs were offered solely to prejudice the jury. We disagree. The four girls were killed in the same explosion and the photographs and the testimony surrounding their introduction were relevant to show the fact of the explosion and the cause of death. The deaths of the girls were part of the res gestae of the crime for which appellant was indicted and their photographs were admissible, even though they evidenced other crimes than the one for which appellant was charged and convicted. Appellant was charged with universal malice and the State was properly allowed to prove all pertinent facts going to show that the act was greatly dangerous to the lives of others and that other persons were killed or injured. Bridges v. State, 225 Ala. 81, 142 So. 56;Boggs v. State, 268 Ala. 358, 106 So.2d 263. There was no error in the admission of the photographs of the three other victims who died in the explosion at the church.
Appellant claims the State was allowed to conduct its cross-examination in an improper manner. He refers to the cross-examination of witnesses Garrett, Wells, Poe and Felton. Garrett was not a character witness. He was questioned about whether he had made a statement that he suspected his uncle (Chambliss) was connected with the bombing and that was the reason he went by his uncle's house before reporting for duty at the police department. The question was permitted as the necessary predicate for impeaching Officer Garrett. Garrett denied making that statement.
Mr. Wells was asked about specific instances of conduct on the part of appellant which involved his character and Wells answered each question in the negative. Mr. Poe answered a question concerning appellant's connection with his church before objection and there was no motion to exclude. No error intervened here. Van Antwerp v. State, Ala.Cr.App.,358 So.2d 782. Mr. Poe also answered another question in the negative. The question posed to Mr. Felton was objected to and withdrawn before answer.
It is settled law that a witness who testifies to the good character and reputation of a defendant may be asked specific questions about the defendant's conduct in order to impeach his testimony or which tend to militate against his reputation or character. Baldwin v. State, 282 Ala. 653, 213 So.2d 819; Crowev. State, Ala.Cr.App., 333 So.2d 902.
Appellant claims that the prosecutor in closing argument attempted to "seed the record" with prejudicial and improper argument. The short answer to appellant's contention is there was no ruling by the trial court. Absent an adverse ruling nothing is presented for review on appeal. Robinson v. State, Ala.Cr.App., 342 So.2d 1331; *Page 1209 Henry v. State, 57 Ala. App. 383, 328 So.2d 634.
Appellant next contends that Mrs. Glenn's out-of-court identification of his photograph as being one of the men she saw parked near the Sixteenth Street Baptist Church in the early morning hours of September 15, 1963, was based on an impermissibly suggestive identification procedure and was unreliable. Viewing her testimony in the light of pertinent case law shows that her out-of-court identification was not unreliable under the totality of the circumstances.
The admissibility of pretrial photographic identification was first considered where the identification of the photograph was coupled with an in-court identification of the accused. InSimmons v. United States, 390 U.S. 377, 88 S.Ct. 967,19 L.Ed.2d 1247, the Court stated that under its decision inStovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, the existence of prejudice must be determined in the light of the totality of surrounding circumstances and held:
 ". . . each case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification . . ."
The holding in Simmons was adapted to apply to those cases in which the out-of-court photographic identifications themselves were admitted into evidence in Neil v. Biggers, 409 U.S. 188,93 S.Ct. 375, 34 L.Ed.2d 401. In this case the Court held that suggestiveness in the identification procedure alone did not make the identification inadmissible. The Court modified the "very substantial likelihood of irreparable misidentification [test]" by deleting the requirement that the misidentification be irreparable. The Court then went on to say that this test's determination of the reliability of the identification was the "central question" where pretrial photographic identifications are introduced. The Court listed certain factors that must be taken into consideration:
 ". . . the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation . . ."
The subsequent case of Manson v. Brathwaite, 432 U.S. 98,97 S.Ct. 2243, 53 L.Ed.2d 140, clarified further the admissibility of pretrial identifications. The Court expressly rejected the exclusion of pretrial photographic identifications based on suggestiveness alone. The Court interpreted Biggers and Simmons
to require a balancing approach in which suggestiveness of the identification procedures must be weighed against the reliability of the identification.
We start with the pivotal question of whether the pretrial procedures were impermissibly suggestive. Childers v. State, Ala.Cr.App., 339 So.2d 597. Mrs. Glenn testified that she was visited by F.B.I. agents on three occasions in the months following the church bombing. She was shown a large book of photographs. Without hesitation she identified photographs of appellant as the man she saw in the parked car near the church at 2:00 a.m. on Sunday, September 15, 1963. She identified these same photographs at trial as State's Exhibits EE and FF.
Mrs. Glenn was visited by an investigator from the Office of the Attorney General about one month before trial. She had been visited by him several months before at which time he showed her an array of more than three dozen photographs and asked her if she could pick out the pictures she had identified to the F.B.I. in 1963. Some of the photographs were black-and-white and some were in color. Seven of this array of photographs, not including the one of appellant, were "mug shots." There was a double photograph of appellant — a *Page 1210 
full face view with the notation "Birmingham, Alabama, 9-30-63" — and a separate profile view which was unmarked. Again, Mrs. Glenn picked out the same photograph she had previously identified to the F.B.I.
Mrs. Glenn's testimony has been set out in detail in this opinion and will not be repeated. A careful review of her testimony will demonstrate beyond question that the identification procedures followed in this case square withNeil v. Biggers, supra; Simmons, and Brathwaite.
The danger of misidentification will be substantially lessened by cross-examination exposing to the jury the potential for errors. Cross-examination, thorough and sifting, is one of the strongest bulwarks for ferreting out errors. Mrs. Glenn was subjected to a most searching and vigorous cross-examination but she never wavered in her identification of the photograph of appellant as the man she saw in the parked car with the dome light on as she was creeping by in her search for a parking place. This was a completely black neighborhood and her attention was naturally focused on white men in that locality at that hour of the morning. Given the extensive — even intensive — cross-examination shown by the record in this case and the presence of several factors indicating the reliability of the out-of-court identification, any suggestiveness attendant to the pretrial photographic identification is far outweighed and no error was committed in the admission of Mrs. Glenn's identification. DeLoach v. State, Ala.Cr.App., 361 So.2d 19; Childers v. State, Ala.Cr.App.,339 So.2d 597; Donilson v. State, Ala.Cr.App., 350 So.2d 738.
Appellant argues that the use of a mug shot of appellant in the photographic array was unduly suggestive relying onHolsclaw v. State, Ala.Cr.App., 364 So.2d 378. Under Holsclaw
mugshots or similar photographs are inadmissible as being prejudicial and as evidencing a defendant's possible involvement in an unrelated crime. That case is distinguishable from this case in that appellant himself introduced into evidence his prior arrest, trial and acquittal for the unlawful possession of dynamite. Not only did appellant fail to object to his prior arrest for possession of dynamite but he introduced into evidence a certified copy of the judgment showing his acquittal. Pitts v. State, supra.
For an excellent discussion on this subject see Judge Bowen's concurring opinion in Donilson v. State, supra.
As we have indicated this case is based on circumstantial evidence. Appellant did not testify. The evidence presented by the State leaves uncontradicted the testimony of Sergeant Cantrell, Ms. Elizabeth H. Cobbs, William Jackson, Mrs. Gertrude Glenn, and Mrs. Yvonne Young. The statements appellant made to Officer Cantrell and Ms. Cobbs were extremely incriminating.
Where the State relies upon circumstantial evidence for a conviction testimony may permissibly take a wide range and any fact from which an inference may be drawn is competent evidence. Green v. State, 258 Ala. 471, 64 So.2d 84; Dockery v.State, 269 Ala. 564, 114 So.2d 394; DeSilvey v. State, 245 Ala. 163, 16 So.2d 183.
We have held on numerous occasions that, where there is legal evidence from which the jury can by fair inference find the accused guilty, this Court has no right to disturb the verdict; (Alabama Digest, Criminal Law, 1159.2 (8). Whether there is such evidence is a question of law, its weight and probative value are for the jury.
A reviewing Court does not determine if the evidence proved defendant's guilt beyond a reasonable doubt and to a moral certainty but rather whether there was legal evidence presented from which the jury could draw an inference of guilt; where legal evidence is presented at trial from which the jury can, by fair inference, find the accused guilty, the reviewing court will not disturb the verdict of the jury. Daniels v. State, Ala.Cr.App., 343 So.2d 566.
In Young v. State, 283 Ala. 676, 220 So.2d 843, the Supreme Court said: *Page 1211 
 "Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the state's evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial, does not constitute error."
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.